AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original   ☐ Duplicate Original

| LODGED | |
| --- | --- |
| CLERK, U.S. DISTRICT COURT | |
| **5/22/2025** | |
| CENTRAL DISTRICT OF CALIFORNIA | |
| BY: _____ MMC _____ DEPUTY | |

# UNITED STATES DISTRICT COURT

for the

Central District of California

| FILED | |
| --- | --- |
| CLERK, U.S. DISTRICT COURT | |
| **05/23/2025** | |
| CENTRAL DISTRICT OF CALIFORNIA | |
| BY: _____ IV _____ DEPUTY | |

United States of America

v.

VAHE MARGARYAN,
  aka "William McGrayan,"
SARKIS SARKISYAN,
  aka "Samuel Shaw,"
AKSEL MARKARYAN,
  aka "Axel Mark,"
ASHOT BEJANYAN,
  aka "Alex Benjamin,"
JACK AYDINIAN,
  aka "Jack Aydi,"
TARON MUSAYELYAN,
  aka "Teyron Musaleyan,"
HOVANNES HOVANNISYAN,
  aka "John Harvard,"
MERY BABAYAN,
  aka "Mery Diamondz,"
ANAHIT SAHAKYAN,
FELIX PARKER,
RUDIK YENGIBARYAN,
  aka "Samuel Stavros,"
YOHAN VACHYAN,
  aka "John Vachyan,"
KHACHATUR NIKOGHOSYAN, and
BORIS SAHAKYAN,

          Defendants.

Case No.   2:25-MJ-03132-DUTY

# CRIMINAL COMPLAINT BY TELEPHONE
# OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the dates of between May 2, 2019 and January 31, 2025, in the county of Los Angeles in the Central District of California, and elsewhere, the defendants violated:

AUSAs: Mark Aveis (x4477), Gregg Marmaro (x8500)

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 286 | Conspiracy to Defraud Government with Respect to Claims |
| 18 U.S.C. § 287 | False, Fictitious or Fraudulent Claims |
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1344 | Bank Fraud |
| 18 U.S.C. § 1956(h) | Money Laundering Conspiracy |
| 18 U.S.C. § 1956(a)(1) | Laundering of Monetary Instruments |
| 18 U.S.C. § 1957 | Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/ Eric Ley, Special Agent*
*Complainant's signature*

Eric Ley, Special Agent, Office of Inspector
General, U.S. Small Business Administration
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    May 23, 2025                          *Patricia Donahue*
_____         _____
                                                       *Judge's signature*

City and state:   Los Angeles, California          Hon. Patricia Donahue, U.S. Magistrate Judge
_____         _____
                                                       *Printed name and title*

AUSAs: Mark Aveis (x4477), Gregg Marmaro (x8500)

## Contents

I.   INTRODUCTION..........................................3

II.  PURPOSE OF AFFIDAVIT..................................4

III. SUMMARY OF PROBABLE CAUSE............................8

IV.  PROBABLE CAUSE.......................................14

     A.   The Paycheck Protection Program................14

     B.   The Economic Injury Disaster Loan Program......16

     C.   PPPL Forgiveness...............................18

     D.   SBA's Preferred Lender Program.................19

     E.   Interview of F.N...............................20

     F.   Interview of A.M...............................26

     G.   SUBJECTS MCGRAYAN, SHAW, and MARK: Wire Fraud,
          Bank Fraud, and Money Laundering re "Dynamic" PLP
          Loan...........................................29

     H.   SUBJECTS MCGRAYAN, MARK, and MUSAYELYAN: Wire
          Fraud, Bank Fraud, and Money Laundering RE "GDI"
          PLP Loan.......................................40

     I.   SUBJECTS MCGRAYAN, HARVARD, and DIAMONDZ: Wire
          Fraud, Bank Fraud, and Money Laundering re "OAS"
          PLP Loan.......................................45

     J.   SUBJECTS MCGRAYAN, BENJAMIN, AND AYDI: Attempted
          Wire Fraud and Bank Fraud re "Alex Titan
          Solutions" PLP Loan............................50

     K.   SUBJECTS MCGRAYAN, ANAHIT, AND PARKER: Wire
          Fraud, Bank Fraud, and Money Laundering re
          "Canmar" PLP Loan..............................56

     L.   SUBJECTS MCGRAYAN and STAVROS: Attempted Wire
          Fraud and Bank Fraud re "Stavros Auto Group" PLP
          Loan...........................................61

     M.   SUBJECTS MCGRAYAN and MUSAYELYAN: False Claim,
          Wire Fraud, and Money Laundering re GUM EIDL....64

     N.   SUBJECT MUSAYELYAN: False Claim, Wire Fraud, and
          Money Laundering re Personal EIDL..............67

     O.   SUBJECT VACHYAN: False Claim, Wire fraud, Bank
          Fraud (PPPL only),and Money Laundering re "Art

Mart" PPP and EIDL................................71

P.   SUBJECT NIKOGOSYAN: False Claim, Wire Fraud, and
     Money Laundering re "CM" EIDL...................75

Q.   SUBJECT BORIS: False Claim, Wire Fraud, Bank
     Fraud, and Money Laundering re "CP Mobile
     Mechanics" PPPL................................77

R.   SUBJECT DIAMONDZ: False Claim, Wire Fraud, and
     Money Laundering re "American Best Filter" EIDL.82

V.   ADDITIONAL PROBABLE CAUSE IN SUPPORT OF REQUEST FOR
     ISSUANCE OF SEARCH WARRANTS........................88

A.   MCGRAYAN Resides and Does Business at the SUBJECT
     PREMISES.......................................88

B.   Training and Experience Regarding the Offense
     Conduct........................................90

VI.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES..........91

VII. CONCLUSION.........................................94

### AFFIDAVIT

I, Eric Ley, being duly sworn, declare and state as follows:

### I.  INTRODUCTION

1.   I have been a federal agent for more than 12 years. Since May 2021, I have been a Special Agent of the U.S. Small Business Administration ("SBA"), Office of Inspector General ("SBA-OIG").  Before that, I was a Special Agent with the United States Secret Service for eight years.

2.   Since graduating from the Criminal Investigator Training Program conducted at the Federal Law Enforcement Training Center, I have over ten years of experience investigating various criminal offenses including bank fraud, wire fraud, and money laundering.  As such, I have interviewed hundreds of witnesses and targets, participated in the execution of numerous search and arrest warrants relating to financial crimes, and worked with federal prosecutors to prepare investigations for prosecution.

3.   For the past four years, I have focused on investigating crimes associated with pandemic stimulus funding, sometimes referred to as Covid-19 fraud, and on fraud against the SBA's Preferred Lending Program.  From reviewing dozens of pandemic stimulus loan files and documents associated with those files, such as subpoenaed bank records and public records, I have become familiar with the processing and vetting of applications under the Paycheck Protection and Economic Injury Disaster Loan programs, among other pandemic-related funding

programs.  From reviewing numerous and similar loan files and
documents associated with those files, I have also become
familiar with the processing and vetting of applications under
SBA-guaranteed lending programs.

4.    Through my investigations, my training and experience,
and discussions with other law enforcement personnel, I have
become familiar with the tactics and methods employed by those
who conduct wire and bank fraud schemes using fraudulent loan
statements and fabricated documents, money laundering, and
identity theft, among other federal offenses.  These methods
include, but are not limited to, the use of wireless
communications technology, such as encrypted messaging platforms
such as "WhatsApp;" the creation or purchase of corporate
"shells," i.e., corporations that have been formed through the
filing of articles of incorporation but conduct no business and
are used solely to create the appearance of legitimacy;
fabricating bank statements or other business documents to
satisfy lender underwriting requirements to qualify for loans;
and moving funds through multiple accounts to promote and
conceal fraud.

## II. <u>PURPOSE OF AFFIDAVIT</u>

5.    This affidavit is made in support of a criminal
complaint against, and request for issuance of arrest warrants
for, the following individuals (also referred to individually at
times as "SUBJECT," or collectively, "SUBJECTS") for violations
of 18 U.S.C. §§ 286/287 (conspiracy to defraud the government
with respect to claims/make false claims), 1343 (wire fraud),

1344 (bank fraud), 1956(h) (money laundering conspiracy), 1956(a)(1) *et seq.* (money laundering), 1957 (engaging in monetary transactions in property derived from specified unlawful activity), and/or 31 U.S.C. §§ 5313, 5324 (structuring), as more fully described below:

VAHE MARGARYAN, AKA WILLIAM MCGRAYAN ("MCGRAYAN");

SARKIS SARKISYAN, AKA SAMUEL SHAW ("SHAW");

AKSEL MARKARYAN, AKA AXEL MARK ("MARK");

ASHOT BEJANYAN, AKA ALEX BENJAMIN ("BENJAMIN");

JACK AYDINIAN, AKA JACK AYDI ("AYDI");

TARON MUSAYELYAN, AKA TEYRON MUSEYELYAN ("MUSAYELYAN");

HOVANNES HOVANNISYAN, AKA JOHN HARVARD ("HARVARD");

MERY BABAYAN, AKA MERY DIAMONDZ ("DIAMONDZ");

ANAHIT SAHAKYAN ("ANAHIT");

FELIX PARKER ("PARKER");

RUDIK YENGIBARYAN, AKA SAMUEL STAVROS ("STAVROS");

YOHAN VACHYAN, AKA JOHAN VACHYAN, AKA JOHN VACHYAN ("VACHYAN");

KHACHATUR NIKOGHOSYAN ("NIKOGHOSYAN"); and

BORIS SAHAKYAN ("BORIS").

6.    This affidavit is also made in support of an application for search warrants for the following:

a.    The person of MCGRAYAN, as more fully described in Attachment A-1 (the "SUBJECT PERSON"); and

b.    6450 Olcott Street, Tujunga, CA 91042-2852 ("SUBJECT PREMISES"), as more fully described in Attachment A-2.

7.    As described more fully below, I respectfully submit there is probable cause to believe the requested search warrants will yield evidence of violations of 18 U.S.C. §§ 286/287 (conspiracy to commit, and making, false claims to the government), 1343 (wire fraud), 1344 (bank fraud), 1956(h) (money laundering conspiracy), 1956(a)(1) *et seq.* (money laundering), 1957 (engaging in monetary transactions in property derived from specified unlawful activity), and/or 31 U.S.C. §§ 5313, 5324 (structuring) (collectively, the "SUBJECT OFFENSES") that were committed by MCGRAYAN and others, known and unknown.

8.    The facts set forth in this affidavit are based on my personal observations; my training and experience; witness interviews that I have conducted; reports that I have read of interviews conducted by other law enforcement agents; my review of documents obtained from third parties, either by way of subpoena or voluntary submission, such as bank or business records; my review of publicly-filed documents such as corporate filings; Internet searches for open source information; financial analyses or financial records summaries prepared by a SBA analyst who told me that she reviewed and prepared such analyses and summaries from bank and other financial records obtained in this investigation, and whom I believe to be qualified to make such analyses and summaries from having worked with her for several years and having reviewed her work product in other matters; and my review of documents created or amassed by the SBA in connection with providing funding for the various loans and grants more fully described below. Accordingly,

absent mention below of specific attribution from any of the above-summarized evidence, I have, solely for clarity, generally omitted attribution for a specific fact or statement.

9.    Whenever I refer herein to a bank, I mean a financial institution whose deposits were insured by the Federal Deposit Insurance Corporation.  Whenever I refer herein to bank records, I have done so by identifying each account by an abbreviation for the bank followed by the account's last four digits, e.g., "JPMC 1234."  Whenever I refer to the substance or content of such accounts, such reference is based on my review of the records of the account(s), including bank statements, signature card/account application documents, canceled checks, offset and credits, and other records provided by each bank pursuant to a grand jury subpoena.  Similarly, unless stated otherwise, whenever I refer to records of or relating to the SBA, I am referring to SBA records that I have reviewed as accessible to me in my capacity as a Special Agent of the SBA-OIG.

10.    My description of the offense conduct below is based on my review of the above-summarized evidence and is provided solely for the purpose of establishing probable cause to believe that one or more of the above-stated offenses were committed by the SUBJECTS.  Accordingly, I have not described all of the evidence that I have reviewed during the course of this investigation and my omission of evidence or mention of other subjects or targets of this investigation should be considered with that limitation.

11.   Unless stated otherwise, all conversations and statements described in this affidavit are related in substance and/or in part only; all dates are "on or about" or approximations; all amounts are rounded or close approximations; and the words "on or about" and "approximately" are omitted for clarity.

12.   Unless otherwise stated, based on my review of the evidence gathered in this case, I believe that all electronic communications, e.g., email or online transmission of information (e.g., a loan application) and transfers of funds between SUBJECTS' accounts as well as the transmission of proceeds of loans or grants were by means of interstate wire transmission in furtherance of wire fraud.[1]

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

13.   I have probable cause to believe that the SUBJECTS committed the SUBJECT OFFENSES by creating, purchasing, or using corporations for use in name only, <u>i.e.</u>, as "shells;" opening or directing others to open multiple bank accounts in the names of those shells; submitting and directing others to submit fraudulent applications, related documents, and fake documents to obtain loans; and then laundering and directing others to launder the proceeds of those loans through various bank

---

[1]   The following information is provided by the AUSA:

In August 2022, the statute of limitations for any criminal charge alleging that a borrower engaged in fraud with respect to PPPs or EIDLs was extended from five to ten years.  15 U.S.C. § 636(b)(16).

accounts for personal use, for a total loss of more than $20,000,000.

14.    Evidence obtained in this case shows, as more fully described below, that SUBJECTS, acting at MCGRAYAN's direction, posed as "owners" of shells; opened shell accounts by providing their genuine identification and signing account-opening documents; signed documents associated with obtaining bank and pandemic stimulus loans; participated in filing tax returns that were plainly fraudulent; and received, as fees for participating, cash or transfers from shell accounts or other sources, and that they did so knowingly and with the intent to defraud and launder money.  I therefore have probable cause to believe, as more fully described below, that such SUBJECTS knowingly participated in the below-described fraudulent scheme and laundered money to further it.  Accordingly, arrest warrants are sought against such SUBJECTS as MCGRAYAN's co-schemers and/or co-conspirators.

15.    Some of the fraudulently obtained loans were funded by more than $1 trillion in taxpayer-based, Congressional appropriations to get the country through the Covid-19 pandemic. Other loans were made by banks under an SBA-guaranteed program to provide individuals or small businesses the opportunity to borrow money to buy or obtain working capital for small businesses where such individuals or small businesses might not otherwise have access to capital.

16.    More specifically, the offense conduct involved the following:

a.  MCGRAYAN and others, known and unknown, met individuals who, with few exceptions, were older and of Armenian or South Caucasus regional descent, at social or spiritual events.  MCGRAYAN and others, known and unknown, convinced such SUBJECTS to become titular owners of newly formed or dormant corporations that were, at most, a "shell" or placeholder for future use.  MCGRAYAN advised such SUBJECTS that owning a shell was legitimate and done to legitimately obtain loans.

b.  The names of the shells were consistent in their vagueness, which lent them some apparent legitimacy, such as "Global 6 Solutions," "Global Ultimate Management," "Mass Exclusive LLC," or "Optimal Business Solutions."  Several such entities purported to conduct information technology services, such as "Dynamic Delivery Install" or "Dynamic IT."  Others appeared to be engaged in some sort of automotive business, such as "CP Mobile Mechanic," "Mobile Auto Repair," or "CM General Auto Electric Supply."  Still others appeared to be in the art or printing field, such as "Art Mart" or "Zart Art Printing."  No matter the shell's name, the SUBJECTS whose names were associated with shell ownership had no intent to conduct business and had no significant, if any, history of similar business ownership or experience.

c.  At MCGRAYAN'S direction, such SUBJECTS opened bank accounts in the names of the shells ("shell accounts"); granted MCGRAYAN and other co-schemers permission to access and to transact business on the shell accounts by providing their personal identifying information and passcodes and facilitating

remote access to computers (including computers provided by MCGRAYAN) via software programs such as "Any Desk;" and provided blank checks to MCGRAYAN and wrote checks on the shell accounts to other accounts or payees.  MCGRAYAN advised such SUBJECTS – as the titular "owners" of shell corporations and the signatories of shell accounts – that the sole purpose of their corporate ownership and the shell accounts was to assist MCGRAYAN in legitimately obtaining loans but the evidence shows that the sole purpose was, instead, to fraudulently obtain and launder proceeds of fraudulently obtained loans.

> d.   Another common feature of the offense conduct was that MCGRAYAN directed such SUBJECTS to sign federal income tax returns for their respective shells, not to report legitimate income, but to fraudulently support loan applications on behalf of their shells because the lenders relied on tax returns as part of the underwriting decision.  I know from my training and experience that individuals commonly submit fake tax returns to lenders to fraudulently obtain loans.  Here, however, MCGRAYAN and such SUBJECTS went a step further.  The evidence shows that the prospective lenders would investigate whether the shells had *actually* filed tax returns with the IRS as opposed to simply providing lenders with copies of what the SUBJECTS represented were the shells' genuine tax returns.  Based on my training and experience, I have observed that many lenders have evolved from earlier underwriting practices to where they actually obtain an applicant's (e.g., a shell's) tax returns directly from the IRS.  Thus, to lend further legitimacy to what I believe were fake

returns, MCGRAYAN paid a tax preparer, in cash, to prepare returns for such SUBJECTS' shells that falsely reported not only substantial income but substantial income tax due.  The evidence further shows that MCGRAYAN assuaged any concern on the part of a SUBJECT in whose shell's name a loan was sought by stating that the financial information on the return was accurate and that he (MCGRAYAN) would ensure that any taxes would be paid.

     e.   MCGRAYAN and such SUBJECTS further, and commonly, attempted to create the appearance of the shells' legitimacy with other fraudulent documents that were provided to lenders in connection with loan underwriting.  For example, I have probable cause to believe that MCGRAYAN and SUBJECTS signed standard form "purchase agreements" that purported to memorialize the purchase of businesses that were, in fact, simply shells with no value; created fake websites and resumes; fraudulently claimed prior employment; doctored bank statements; and concocted office leases or obtained cheap office space leases, again solely to fraudulently create the appearance that the shells were going concerns.

     f.   Finally, ill-gotten loan proceeds were routinely laundered back and forth through shell accounts in a process called "layering."  For example, loan proceeds were initially deposited into an account for the applicant/shell.  MCGRAYAN then directed the SUBJECT who was the signatory on the account to deposit checks from other shells into that shell account. MCGRAYAN then remotely accessed that shell's bank account and transferred funds to other shell accounts; directed the account

holder to give him the checkbook for that shell's account; or directed the account holder to purchase cashier's checks for deposit into another shell account.  This was done for multiple reasons.  First, transfers into and out of shell accounts were conducted to make it appear that the shell account had genuine business activity.  Transfers to individuals were kept at a minimum; most transfers were in the name of, again, shell entities whose names, again, seemed legitimate.  Next, transfers from other shell entities to a shell/applicant's account that appeared to show legitimate business activity were done to satisfy a loan condition that a SUBJECT had sufficient downpayment or equivalent funds to buy another (fake) business. Next, SUBJECTS used those same accounts to conceal the ill-gotten loan proceeds.  And there were literally thousands of laundered transactions, including many in amounts of just under $10,000, evidencing structuring to avoid Bank Secrecy Act reporting requirements.[2]  The SUBJECTS ultimately used the

---

[2]    The following legal authority was provided by the AUSA:

Federal law requires banks and other financial institutions to file reports with the Secretary of the Treasury whenever they are involved in a cash transaction or exchange of currency that exceeds $10,000.  "A person who willfully violates this law is subject to criminal penalties."  31 U.S.C. §§ 5313, 5324; 31 CFR § 103.22(a),(b)(2006 Ed.); *Ratzlaf v. United States*, 510 U.S. 135, 136 (1994); *see also, United States v. Turner*, 400 F.3d 491, 497 (7th Cir. 2005)(in case charging conspiracy to launder money, "we know that certain types of transactions may be indicative of a design to conceal.  These include transactions surrounded in unusual secrecy, structured transactions, depositing ill-gotten funds into another's bank accounts, using third parties to conceal the real owner, or engaging in unusual financial moves which culminate in a transaction.").

proceeds for personal uses or for purposes plainly not authorized by the terms of the loans.[3]

### IV. <u>PROBABLE CAUSE</u>

**A.    The Paycheck Protection Program**

17.    The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or about March 2020 that was designed to provide emergency financial assistance to Americans suffering economic harm as a result of the COVID-19 pandemic.  One form of assistance provided by the CARES Act was the authorization of United States taxpayer funds in the form of loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP; loans under that program are sometimes referred to herein as a "PPPL" or "PPPLs").  PPPL proceeds were required to be used by the applicant business to pay certain expenses such as payroll costs, interest on mortgages, rent, and utilities.

---

[3]    The following legal authority was provided by the AUSA:

Joinder of criminal defendants is appropriate if they "are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b); *see also Zafiro v. United States*, 506 U.S. 534, 537 (1993) ("There is a preference in the federal system for joint trials of defendants who are indicted together.").  Trying codefendants together is "the rule, rather than the exception ... especially in conspiracy cases." *See, e.g., United States v. Barnes*, 979 F.3d 283, 316 (5th Cir. 2020).  If defendants are tried together, the court can give the jury instructions to consider each count, and the evidence pertaining to it, as to each defendant.  "A jury is presumed to follow [the court's] instructions." *Weeks v. Angelone*, 528 U.S. 225, 234 (2000).

18.   In order to obtain a PPPL, a qualifying business was required, among other things, to submit a PPPL application that required the applicant business (through its authorized representative) to acknowledge PPP program rules and make certain affirmative certifications that the applicant business would comply with all such rules to be eligible to obtain a PPPL.  Such certifications required, among other things, that the applicant affirm that "[PPP] funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments," and that the "loan proceeds will be used only for business-related purposes as specified in the [PPPL application]" and consistent with PPP rules.  The authorized representative of the applicant was also required to certify that "the information provided in th[e] PPP application and the information provided in all supporting documents and forms is true and accurate in material respects," and that "I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud."

19.   A PPPL applicant's representative was also required to state, among other things, the applicant's average monthly payroll expenses and number of its employees.  These figures were used to calculate the amount of money that the business was eligible to receive under the PPP.  In addition, the applicant's representative was required to provide documentation showing its payroll expenses and such other documentation as the SBA or the lender requested.

20.    A PPPL application and supporting documents were submitted online through a portal and processed by a participating lender.  The applicant's representative confirmed his/her true identity through a variety of means including providing personal identifying information, uploading a copy of that person's driver's license and/or Social Security card, and/or executing loan documents via a document authentication platform such as DocuSign.  If a PPPL application was approved, the participating lender would fund the PPPL using its own funds and would wire-transfer those funds to a bank account designated by the applicant.  By wire-transferring the loan proceeds to that designated account, the lender, the SBA and, ultimately, law enforcement would have yet another way to ensure that the application was sought by the stated applicant through his/her duly acting representative and that the applicant received and used those funds in accordance with PPP rules.

21.    If PPP lending criteria were followed by the lender, the SBA, in turn, guaranteed the borrower's repayment in the event of that borrower's default.

**B.    The Economic Injury Disaster Loan Program**

22.    In addition to the PPP, the CARES Act authorized taxpayer funds under the Economic Injury Disaster Loan program (individually, an "EIDL," or, collectively, "EIDLs").  The EIDL program provided low-interest funding to small businesses, renters, and homeowners affected by the COVID-19 pandemic.

23.    In order to obtain an EIDL, a qualifying business was required to submit an application to the SBA, typically through

an online portal, and provide information about its operations, such as the nature of the applicant's business (e.g., "agriculture"), the number of employees, and gross revenues for the 12-month period preceding the Covid-19 pandemic.  Like PPPLs, EIDL applicants were required to certify that all information in the application as provided by the applicant or on behalf of the applicant by their authorized representative was true and correct.

24.   An EIDL "Loan Authorization and Agreement" ("LA&A") was executed by the applicant's authorized representative as a condition of receipt of EIDL proceeds.  The LA&A required that the applicant would use the EIDL proceeds only for purposes stated in EIDL rules, such as for employee payroll expenses, employee sick leave, and business obligations and expenses such as business debts, rent, and mortgage payments.  EIDL funds could not be used other than for those purposes, including that such funds could not be deposited or held for future business operations, used to capitalize a new business or for business start-up expenses, or used for purposes not associated with the operation of a going concern.

25.   The amount of an EIDL was determined, in part, by the applicant's representations in the EIDL application about the nature of the applicant's business and the applicant's statements about employees and revenue.  Any funds paid under an EIDL were issued directly by the SBA from CARES Act appropriations by Congress.

26.    If the EIDL applicant also obtained a PPPL, EIDL proceeds could not be used for the same purpose as the PPP loan proceeds.

27.    PPP and EIDL applicants were also obligated to provide true and correct information in response to requests by PPP lenders or the SBA as part of the PPPL and EIDL vetting process, such as requests to clarify business ownership and requests to provide genuine payroll tax documents such as IRS Forms 940, 941, or W3 "Transmittal of Wage and Tax Statements."

**C.    PPPL Forgiveness**

28.    Under certain circumstances, PPP borrowers were entitled to forgiveness of their PPP obligations.  As a condition of forgiveness, borrowers were required to complete a "PPP Loan Forgiveness Application" on which their authorized representative represented and certified that the borrower had complied with all PPP rules "including the rules related to  . . . eligible uses of PPP loan proceeds[]" and that "[t]he information provided in th[e forgiveness application was] true and correct in all material respects."  The forgiveness application warned that "knowingly making a false statement to obtain forgiveness was a federal crime, punishable by imprisonment and/or a fine."

29.    I know from my training and experience, and from evidence gathered in this case, that PPP lenders and the SBA relied on an applicant's truthfulness in statements made on applications and related documents, and on the genuineness of

documents submitted by applicants in support of applications, to determine whether to approve PPPLs or EIDLs.

### D.    SBA's Preferred Lender Program

30.    Both before, throughout, and after the Covid-19 pandemic, the SBA offered loans to finance the purchase or start-up of, or for working capital for, small businesses through a program known as Preferred Lender Program ("PLP"). Such loans (herein individually referred to as a "PLP," or collectively as "PLPs") were offered to small businesses or individuals seeking to buy or improve small businesses who might not be eligible for business loans through normal lending channels.

31.    PLPs were administered by financial institutions or other lenders that conducted underwriting or due diligence, including, for example, site visits, requesting an applicant's financial statements, obtaining federal income tax returns from the IRS, verifying proof of good faith downpayments or deposits, independently evaluating businesses to be acquired, evaluating the seller's accounts receivable, and reviewing leases for business space.  A PLP lender that complied with SBA underwriting guidelines was eligible for an SBA guarantee of a substantial part of the loan in the event of a borrower's default.

32.    I know from my training and experience that PLP lenders and the SBA relied on the parties' truthfulness in statements made on PLP applications and in related documents, or provided through escrow holders or business brokers, and on the

genuineness of documents submitted in support of applications, to determine whether to approve PLPs.

**E.    Interview of F.N.**

33.    On May 2, 2025, I interviewed F.N.  F.N. told me the following, among other things:

a.    He recognized MCGRAYAN from a photograph that I showed him.  (The photograph came from a genuine copy of MCGRAYAN's driver's license.)

b.    F.N. is a musician.  He met MCGRAYAN in 2016 at social events where F.N. performed.  F.N. befriended MCGRAYAN and was ultimately hired by MCGRAYAN to perform music at MCGRAYAN's house.  F.N. was impressed by MCGRAYAN because MCGRAYAN seemed reliable and resourceful.  MCGRAYAN called F.N., "brother" and said that he (MCGRAYAN) was an attorney.[4]

c.    Near the end of 2018 or in early 2019, F.N. was blinded by a reaction to medication.  MCGRAYAN visited him and appeared empathetic.  MCGRAYAN told F.N. that he (MCGRAYAN) would help F.N. recover by starting a business to sell guitar lessons online, something that F.N. had wanted to do.

---

[4]    I searched the California State Bar's license lookup site and found no record that MCGRAYAN was a member of the California Bar.  I did query law enforcement databases for records of individuals who sought fingerprinting and found an entry that MCGRAYAN was fingerprinted on May 29, 2019, as part of his application for a State Bar license but that as of July 21, 2022, he was "no longer interested."  I also conducted an open source/Internet search and found no result that MCGRAYAN is or was a member of the bar of any other state.  I did see online a "LinkedIn" page for MCGRAYAN that stated that MCGRAYAN graduated from Southwestern Law School in 2015 and then was enrolled in  an L.L.M. program in banking and securities law offered by the University of Southern California.

d.    MCGRAYAN then told F.N. that he started a business for F.N. called "Music E Solutions" but did so without F.N.'s knowledge or permission.  F.N. did not conduct any business activity with Music E Solutions and, around May 2019, F.N. spoke to MCGRAYAN who suggested that the company named be changed to "Mobile Auto Repair, Inc." ("MARI").  F.N. asked MCGRAYAN if that was legal and MCGRAYAN said that it was. MCGRAYAN then directed F.N. to go to a location in downtown Los Angeles to register MARI in F.N.'s name.  F.N. did so. (I know from reviewing California Secretary of State records that on May 2, 2019, a Statement of Information ("SOI") was filed that reflected that F.N. became MARI's sole officer and director.  I also know from reviewing California Secretary of State records that MARI was incorporated in June 2017 and that it was suspended due to the failure to file a SOI until F.N. filed an SOI in May 2019.  I believe, based on my training and experience that the history of MARI's incorporation is consistent with that of forming a "shell" corporation for later sale or use.)

e.    F.N. knew nothing about being a mechanic and did not intend to operate MARI as a mechanic or any other business.

f.    Around the same time (May 2019), MCGRAYAN directed F.N. to open multiple bank accounts in the name of MARI with F.N. as the sole signatory.  F.N. thought doing so was suspicious and questioned MCGRAYAN why he should do so and whether it was legal.  MCGRAYAN said that it was necessary to help qualify for loans and that it was legal.  MCGRAYAN rebuffed

21

F.N.'s inquiry by questioning F.N.'s loyalty to MCGRAYAN, saying things like "brother, it's ok" or words to that effect.

g.   MCGRAYAN also told F.N. that money from some unnamed "business in New York" would be deposited into the MARI accounts.  MCGRAYAN told F.N. to give MCGRAYAN access to the accounts by providing MCGRAYAN with F.N.'s driver's license and Social Security numbers, date of birth, and accounts passcodes. MCGRAYAN also told F.N. to give MCGRAYAN and "the New York guys" remote access to F.N.'s computer.  F.N. provided the government an excerpt of a WhatsApp chat, more fully discussed below, in which MCGRAYAN told F.N. to use "Any Desk" for remote access. (I learned from an open source/Internet search that "Any Desk" is a software application that allows remote access of a computer.)

h.   MCGRAYAN directed F.N. to deposit checks into the MARI accounts.  F.N. received checks by mail and, as MCGRAYAN had directed him, F.N. took pictures of those checks, sent those images to MCGRAYAN, and deposited the checks into one of the MARI accounts.

i.   At MCGRAYAN's direction, F.N. brought blank checks for one or more of the MARI accounts to MCGRAYAN at MCGRAYAN's house.

j.   At MCGRAYAN's direction, F.N. withdrew funds from one or more of the MARI accounts and used those funds to buy cashier's checks in amounts as directed by MCGRAYAN.  F.N. recalled buying cashier's checks from Bank of the West.  (I know from reviewing records from Bank of the West that F.N. bought

cashier's checks of $175,000 (11/24/2021), $141,910
(12/16/2021), $308,000 (12/17/2021), $485,010 (1/20/2022), and
$518,151 (5/12/2022).)  MCGRAYAN directed F.N. to deposit the
cashier's checks into a MARI account and then divide those
amounts into smaller checks and move them to other accounts.

        k.  F.N. personally appeared at branches of the banks
to open the MARI accounts at MCGRAYAN's direction.  In each
case, F.N. presented bank employees with F.N.'s genuine
identification documents and signed signature cards and account
opening documents.  (I know from reviewing the signature cards
and bank records that there were five MARI accounts and that
each was opened and maintained at a bank branch located in Los
Angeles County.)

        l.  F.N. estimated that, at MCGRAYAN's direction,
F.N. signed dozens, if not hundreds, of checks to move money
between not only the MARI accounts but accounts in the names of
what he believed were fake corporations like MARI.  F.N.
estimated that he signed numerous other documents at MCGRAYAN's
direction and saw other documents that he did not sign but that
had his signature that had been "cut and pasted."

        m.  MCGRAYAN largely communicated with F.N. over the
"WhatsApp" messaging platform.  (I know from my training and
experience that "WhatsApp" is an end-to-end encrypted messaging
platform that is commonly used to conduct criminal activity.)
Below are excerpts from a WhatsApp exchange between F.N. and
MCGRAYAN that F.N. provided that show MCGRAYAN's direction to

F.N. to permit MCGRAYAN's 24-7 access to F.N.'s computer and
MCGRAYAN's "frustrati[on]" with F.N.:




n.    There were three other individuals on MCGRAYAN's
team that came to meet F.N. to deliver documents or to obtain
F.N.'s signature on them.  On one occasion, a member of the team
delivered to F.N. a completed federal income tax return for MARI
that had F.N.'s name on the return and required his signature.
F.N. reviewed the return and saw entries that he had no idea
about or whether the information was correct.  F.N. noticed that
the return indicated that MARI had a large amount of tax due.
F.N. was concerned about being responsible for the taxes and
spoke to MCGRAYAN.  MCGRAYAN told him "don't worry, we will

handle the tax payments" or words to that effect.  F.N. later
learned that no taxes were ever paid.[5]

o.    MCGRAYAN directed messaged F.N. over WhatsApp to
deposit checks into specific accounts; MCGRAYAN attached images
of those checks and emailed those checks to F.N.  (See above for
an example.)

p.    MCGRAYAN directed F.N. to participate in seeking
loans, including bank loans and PPPLs and EIDLs.  F.N. was
suspicious about the legitimacy of doing so, but MCGRAYAN told
him not to worry because MCGRAYAN would make sure that the loans
were repaid.  (I know from reviewing the evidence in this case
that there was at least one loan of $250,000 by JPMorgan Chase
to MARI whose payments were made from what I believe to be
laundered proceeds; a PPP loan for $24,345; and nearly $1.5
million in EIDL and EIDL modifications.)

q.    MCGRAYAN directed F.N. to make calls to help get
loans approved.

r.    MCGRAYAN directed F.N. to conduct the foregoing
activities over WhatsApp for several years.

s.    F.N. became increasingly afraid of MCGRAYAN as
MCGRAYAN's tone became more belligerent when F.N. questioned
MCGRAYAN about whether what they were doing was legal.  MCGRAYAN
told F.N. that they had a "blood pact, and that you don't want
to fuck with me or the New York guys."

---

[5]  A law enforcement database query revealed that MCGRAYAN
in July 2020 was fingerprinted in connection with applying to be
a licensed tax preparer.

t.    F.N. believed that MCGRAYAN was "scary and unhinged." He was at MCGRAYAN's house in 2022 and saw MCGRAYAN pull out a gun[6] and baseball bat and approach a man who had just arrived in a car. F.N. saw MCGRAYAN approach the man and saw MCGRAYAN wield the bat and heard MCGRAYAN scream at the man. MCGRAYAN said that he called the FBI on the man. MCGRAYAN several times over the years of their dealings told him, "don't fuck with us." MCGRAYAN told F.N. that MCGRAYAN grew up with gangs in Armenia and was a semi-professional boxer.

u.    F.N. moved to Japan in or about March 2025, in part out of concern for his safety for having been involved with MCGRAYAN that was triggered by receiving a target letter. (I served F.N. with a target letter regarding this investigation in February 2025.)

**F.    Interview of A.M.**

34.    I interviewed A.M., who told me the following, among other things:

a.    He is a tax preparer.

b.    He met MCGRAYAN socially around 2021 and told MCGRAYAN that he was starting a tax preparation business.

c.    MCGRAYAN started referring clients to him around that same time. MCGRAYAN told him that the clients needed tax returns prepared to help qualify for loans.

---

[6] A law enforcement database query shows that MCGRAYAN was fingerprinted on September 24, 2024, in connection with his application to the Pasadena Police Department for a concealed firearm carry permit.

      d.   A.M. received several client referrals from MCGRAYAN (collectively, the "MCGRAYAN Clients"). A.M. identified by name the several MCGRAYAN Clients including (SUBJECTS) SHAW, MARK, BENJAMIN, AYDI, VACHYAN, NIKOGHOSYAN, HARVARD, ANAHIT, STAVROS, DIAMONDZ, and BORIS.

      e.   A.M. prepared tax returns on behalf of the MCGRAYAN Clients for their respective business entities based on scant financial statements or information that each client provided either in a face-to-face meeting with A.M. or by email. A.M. thought the financial statements were "odd" but clients told him that the financial statements were prepared "overseas." A.M. produced several email examples of requests to prepare tax returns for MCGRAYAN Clients, to which financial statements were attached, including the following:



27

f.    As shown by the example above, A.M. was hired to prepare multiple years' tax returns for a client's purported business entity (here, a shell) where at least some of the returns were untimely.  Thus, it was typically, if not always, the case that the returns were prepared and signed on the same day for multiple years.

g.    A.M. verified the identity of each of the MCGRAYAN Clients by meeting each of them face-to-face when they signed each return or by obtaining from each such client copies of their photo identification so that he could then have each such client sign each return using the DocuSign online authentication platform.

h.    Each MCGRAYAN Client signed the return(s) without objection or question, including when A.M., as he typically did, told the MCGRAYAN Client, "you owe a lot of taxes" and also explained to each of them the consequences of failing to pay such taxes.

i.    MCGRAYAN directed A.M. to e-file each such return.

j.    MCGRAYAN, not the clients, paid A.M., in cash, to prepare each return.

k.    A.M. was happy to get the referrals from MCGRAYAN because he (A.M.) was just starting his tax return preparation business.

28

**G.    SUBJECTS MCGRAYAN, SHAW, and MARK: Wire Fraud, Bank Fraud, and Money Laundering re "Dynamic" PLP Loan**

35.    In June 2023, SHAW[7] applied to Grasshopper Bank ("GB") for a $2,830,000 PLP loan to purchase "Dynamic Delivery Install, Inc" from MARK (the "Dynamic PLP").  In summary, I have probable cause to believe that MCGRAYAN, SHAW, and MARK schemed to defraud GB by making false statements and submitting phony documents, including fraudulently concealing SHAW's criminal history, lying about prior employment, and providing fake bank statements and fake federal income tax returns.  The Dynamic PLP was approved and its proceeds disbursed to a shell account whose signatory was MARK who, in turn, laundered the proceeds through other shell accounts and structured cash withdrawals to further conceal the fraudulent use of loan proceeds.

36.    I reviewed the Dynamic PLP loan file provided by GB and learned the following:

a.    On a standard "SBA 7(a) Borrower Information Form" that I am familiar with from examining numerous PLP loan files, SHAW was identified as the "100%" owner of the purchaser, "Dynamic IT Solutions, Inc."

b.    A June 2023 "business purchase agreement" identified "Dynamic IT Solutions, Inc." as the buyer and "Dynamic Delivery Install Inc.," as the seller.  MCGRAYAN was

---

[7]    I have concurrently applied for an arrest warrant on a complaint affidavit alleging that SHAW and others to whom he is related or engaged in business fraudulently sought pandemic stimulus funds by submitting phony documents and then misusing those funds.  I hereby incorporate that complaint affidavit (attached here as Exhibit A) as further probable cause to believe that SHAW committed the offense conduct described herein.

identified as the broker through his business, "Exceed
Companies." I have seen these standard form "business purchase
agreements" in the other PLP loan transactions described below
that I believe to be similarly fraudulent. Each such
transaction also identified the same escrow company, "Escrow 1,"
and the same escrow officer, "Escrow Officer 1."

37. The files for the Dynamic PLP identified SHAW as the
buyer's representative based on an image of SHAW's genuine
driver's license that matched SHAW's driver's license and
referenced SHAW's residence address at the same address shown on
his driver's license. I know from my training and experience
that PLP lenders require documentary proof of parties'
identities in the form of photos of driver's licenses, Social
Security cards, or passports.

38. On April 3, 2023, as part of GB's due diligence, SHAW
signed a "personal resume" in which he identified himself as
SHAW, with his true date of birth, Social Security Number, and
driver's license. SHAW checked the box, "no," in answer to the
question, "have you ever been charged with and/or arrested for
any criminal offense other than a motor vehicle violation? This
includes offenses which have been dismissed, discharged or not
prosecuted." I obtained copies of SHAW's driver's licenses
under both his given name, "Sarkis Sarkisyan," and SHAW,
depicted here:

 

39.    I know from law enforcement databases that SHAW, under his birth name, "Sarkis Sarkisyan," was convicted of felonies in the State of California in 2011.[8]    I know from my training and experience in investigating PPP, EIDL, PLP, and other SBA-related loan fraud cases that lenders deem borrower's criminal histories material to evaluating whether to approve loans.

40.    SHAW also listed on the same document his "business experience" as including prior employment by "Oncore Inc.," "from 2012 to 2020" as "IT Specialist – Handling Technical Support on Daily Basis."    I interviewed H.A. in connection with visiting Oncore Inc. at the same address that SHAW had given. (H.A. was not present but I spoke to him over the phone on a call placed to him by an Oncore employee at my request.)    H.A. said that he was a co-owner of Oncore Inc. and that Oncore Inc. employed IT specialists and dispatchers.    H.A. said that neither Sarkis Sarkisyan or SHAW were ever employed by Oncore Inc. and that H.A. did not know SHAW.    I know from my training and experience in investigating this and similar cases that an

---

[8]    In 2011, SHAW was convicted in Santa Clara Superior Court, case no. B1151803, of unauthorized access to computers (Cal.Pen.C. sec. 502(c)(1)), theft of credit card information (Cal.Pen.C. sec. 484e), counterfeiting credit cards (Cal.Pen.C. sec. 484i), and conspiracy (Cal.Pen.C. sec. 182).

applicant's statement about prior employment, especially a claim
of prior employment in a field relevant to the application, is
considered material to evaluating whether to approve a loan.  I
also know from reviewing evidence gathered in this investigation
that it was common for SUBJECTS to claim to own "IT"
(information technology) companies or to engage in "IT" work,
including making claims that their IT companies hired offshore
contractors where, based on the totality of the evidence, I
believe such claims were false.

41.    I know that PLP lenders typically required that
borrowers provide proof of funds for deposits to show that
borrowers had "skin in the game," similar to where lenders
require that applicants for home mortgages put up downpayments.
The required deposits were typically quite large, such as more
than $400,000 in cash for a $3 million loan.  I also know that
such funds must be "seasoned," meaning that such funds had to be
in the account for a reasonable time before a loan application
was submitted to mitigate the lenders' risk that such funds were
borrowed or not otherwise based on the borrower's legitimate
financial activity.

42.    GB received four months of purported bank statements
to prove that SHAW had seasoned funds sufficient to pay the
deposit of $465,000 as required under the Dynamic PLP business
purchase agreement.  The bank statements that SHAW provided to
GB depicted a JPMC account ending in 3038 (the "JPMC 3038") in
SHAW's name at the same address shown on his driver's license.
I know from reviewing genuine statements that SHAW opened that

account on January 6, 2023 by providing his true Social Security
number, driver's license number, and date of birth, and that he
gave that same address as his residence address.

43.    I believe that the JPMC 3038 statements that were
provided as proof of SHAW's deposit funds were fake (the "SHAW
Statement(s)").   The SHAW Statements started with January 2023
and went through May 2023.   For example, the first such SHAW
Statement, for January 24 through February 21, 2023, indicated a
beginning balance of $802,959.56.   However, I compared that
statement for the same period to the genuine statement that I
obtained from JPMC for JPMC 3038.   The genuine statement's
beginning balance was $2,959.56, or $800,000 less than the
beginning balance shown on the SHAW Statement.   Based on my
training and experience, I believe that the SHAW Statement was
"photoshopped" or otherwise altered through the use of software
like Adobe Photoshop.[9]   The ending balance for the same period on
the SHAW Statement was $858,421.36, or approximately $800,000
more than the true ending balance for the same period on genuine
statement, $86,421.91.   The SHAW Statements for the three months

---

[9]    I know from my training and experience that fraudsters
use Adobe Photoshop or similar programs, some of which are
available online for free, to create phony bank or business
documents.   The process is, unfortunately, quite simple: the
fraudster scans a genuine document, say a bank statement, to
create a digital file.   The program then digitizes the
characters in the document, thus enabling the characters to be
manipulated or changed.   The fraudster then edits the document
to his or her liking and saves the fake in "pdf" format.   The
fraudster would not email the fake "pdf" version because the
"properties" feature could be used to reveal the manipulation.
Thus, the fraudster would instead print the fake version and
forward that printed version or save that printed version
(neither of which would have incriminating "creation date" or
similar metadata) to the lender.

thereafter reflected the false balance and ultimately, but falsely, showed seasoned downpayment funds available to close the deal.  Here are images of the first SHAW Statement and the genuine statement (the SHAW Statement is on the left; the genuine statement is on the right):



44.    I also found it to be common practice that PLP lenders required that borrowers provide federal income tax returns as part of loan underwriting.  The loan file for the Dynamic PLP contained what purported to be Form 1040 federal income tax returns for SHAW for calendar years 2020, 2021, and 2022.  Each return contained the name of the same preparer, A.M., who, as stated above, identified SHAW as one of many MCGRAYAN Clients for whom he prepared business entity returns solely to qualify for loans (as opposed to needing to file their returns to comply with income tax laws).  I have probable cause to believe, based on the totality of the evidence, including F.N.'s statement, that SHAW, like all other participants in the fraudulent PLPs discussed herein, signed and caused the returns

to be filed knowing that the returns were fraudulent and obtained solely to qualify for PLPs, and that each such SUBJECT well knew that they were participating in a fraudulent scheme for that reason alone, notwithstanding that any such SUBJECT may have been told by MCGRAYAN that signing such returns, or doing any other act to accomplish something that was false or fraudulent, was otherwise "legitimate" or "legal."[10]

45.    Each of the tax returns provided to GB was prepared by A.M. on the same day, February 14, 2023; thus, the 2020 and 2021 returns were untimely and, therefore, I have further probable cause to believe that the returns had been prepared to support SHAW's loan application as opposed to reporting genuine financial activity.

46.    A.M. further stated that he prepared the tax returns for his clients solely on the basis of information provided by the client and that he verified the identity of his clients during face-to-face meetings or requested and received via email a photocopy of their driver's license and Social Security card. A.M. said that his clients either signed their returns in his presence or via the "DocuSign" signature authentication platform.

47.    On each of the tax returns that were provided to GB, SHAW represented that he earned hundreds of thousands of dollars

---

[10]    Based on SHAW's offense conduct described in the concurrently submitted complaint affidavit describing SHAW's fraud in connection with seeking a PPP for a different phony shell, "Prime Funding" (*see* Exhibit A), I also have probable cause to believe that SHAW well knew that the returns were fraudulent and had them prepared with the intent to defraud GB.

annually as an "IT Specialist." He reported owing approximately $165,000 in federal income taxes in total for those tax years (2020-2022). Based on my investigation, I found nothing to indicate that SHAW paid any such income tax. I also noted that, despite stating that he was employed by Oncore Inc. for 2012-2020, he never reported any compensation from Oncore Inc.

48. I also found to be common practice that PLP lenders obtained "transcripts" from the IRS to confirm that loan applicants *actually* filed the returns that they provided to the lenders. (In some cases, the lenders obtained such returns from the IRS.) I know from my training and experience that IRS transcripts are summaries of IRS filings that include, for example, the tax year for a return, the date the return was filed, the adjusted gross income and tax due and payable per the return, and penalties or interest assessed for late-filed returns.

49. The Dynamic PLP loan file contained IRS transcripts that I believe to be genuine. The transcripts showed that each of the above-described returns was untimely; that each was actually submitted to the IRS on the same day; that the 2020 and 2021 returns were assessed a late filing penalty; and that each return reported substantial tax due and owing, collectively approximately $165,000, not including penalties or interest. I have learned in the course of this investigation that a common feature of the fraudulent scheme was different from other fraud schemes where perpetrators simply provided unfiled income tax returns to lenders for underwriting. Here, perpetrators

actually filed tax returns with the IRS but the returns contained false information, including huge income numbers and large taxes due and owing.  Based on the evidence gathered in this investigation, I believe that the SUBJECTS who signed or caused to be filed such returns – late, through the same preparer, solely to obtain loans, claiming large income and large tax due and owing, but paying no taxes – did so solely to create the appearance of substantial income and the ability to repay their loans, and all solely to satisfy lender underwriting criteria.

50.    GB approved the Dynamic PLP loan application.  A closing statement in the Dynamic PLP loan file identified Escrow Officer 1 as the escrow officer.  I know from this investigation that Escrow Officer 1 was the same escrow officer at Escrow 1 for several fraudulent PLP loans, some of which are described herein.

51.    Based on my review of the Dynamic PLP loan file and bank statements obtained via subpoena, I know that the $2,748,546 in net loan proceeds were wired from GB to an Escrow 1 account at City National Bank in Los Angeles on June 13, 2023.  Together with the $465,000 deposit, Escrow 1 disbursed those proceeds, in relevant part, as follows: (1) a check for commissions to MCGRAYAN for $62,000, and (2) a check to the purported seller, Dynamic Delivery Install, Inc. (MARK's shell company), for $3,021,606.

52.    The Dynamic PLP proceeds check for $3,021,606 was mailed to an address that I know from law enforcement databases

to be MARK's residence address.  I obtained from JPMC via subpoena, and reviewed, records for an account ending in 0835 (the "JPMC 0835") and learned the following:

a.    The proceeds check for $3,021,606 was deposited on June 14, 2023 into the JPMC 0835:

### DEPOSITS AND ADDITIONS

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 06/06 | Credit Return: Online Payment 17251673505 To Rshtuni Consulting Services, Inc. | $8,360.55 |
| 06/14 | Deposit     2030113860 | 3,021,606.38 |
| **Total Deposits and Additions** | | **$3,029,966.93** |

b.    MARK opened the JPMC 0835 under the name of Dynamic Delivery Install, Inc. on June 30, 2020, by presenting his true Social Security number and identifying himself as "president."  I compared MARK's signature on the signature card for the 0835 account with his California driver's license and believe they were signed by one and the same person:




c.    The balance in JPMC 0835 before the deposit of the Dynamic PLP proceeds check was $44,769.26, a small balance compared to the PLP proceeds check of more than $3 million, thus making it easy to trace the use of those proceeds:

### CHECKING SUMMARY    Chase Platinum Business Checking

| | INSTANCES | AMOUNT |
|---|---|---|
| Beginning Balance | | $44,760.26 |
| Deposits and Additions | 2 | 3,029,966.93 |
| Checks Paid | 1 | -400.42 |
| ATM & Debit Card Withdrawals | 6 | -284.70 |
| Electronic Withdrawals | 40 | -768,057.15 |
| Other Withdrawals | 4 | -18,000.00 |
| Ending Balance | 53 | $2,287,984.92 |

d.    As shown on the above-depicted "checking summary," there were 40 electronic withdrawals totaling $768,057 from the JPMC 0835, substantially all of which came from the Dynamic PLP loan proceeds check.  The same bank statement showed that those withdrawals occurred over only three days and all to shells whose owners, and the sole signatories on the shells' bank accounts, were SUBJECTS BENJAMIN ("Arms of Olympus"), HARVARD ("Olympus Axv Solutions"), PARKER ("Mass Exclusive"), NIKOGHOSYAN ("CM General Auto Electric Supplies"), and STAVROS ("Hawk Fleet"):[11]

| 06/28 | 06/28 Online Payment 17741507588 To Thunkked Out, Inc | 13,690.99 |
| 06/28 | 06/28 Online Payment 17741516729 To Arms of Olympus LLC | 13,680.99 |
| 06/28 | 06/28 Online Payment 17741507581 To Art Mart, Inc. | 12,950.99 |
| 06/28 | 06/28 Online Payment 17741507574 To 911 Janitorial Services LLC | 18,590.99 |
| 06/28 | 06/28 Online Payment 17741516739 To Mass Exclusive LLC | 17,580.95 |
| 06/28 | 06/28 Online Payment 17741507582 To Cm General Auto Electric Supplies,Inc. | 19,570.99 |
| 06/29 | 06/29 Online Payment 17744313081 To Hawk Fleet LLC | 13,580.75 |
| 06/29 | 06/29 Online Payment 17744313086 To Peace And Care Hospice, Inc. | 10,930.99 |
| 06/29 | 06/29 Online Payment 17741595066 To 911 Janitorial Services LLC | 24,950.99 |
| 06/29 | 06/29 Online Payment 17741507585 To Olympus Axv Solutions Inc | 22,920.99 |
| 06/29 | 06/29 Online Payment 17741595074 To Arms of Olympus LLC | 11,820.95 |
| 06/29 | 06/29 Online Payment 17741595070 To Alpha Omega Solutions, LLC | 10,280.95 |
| 06/30 | 06/30 Online Domestic Wire Transfer A/C: Prime Funding, Inc. VAN Nuys CA 91405-2970 US Tm: 318285318iEs | 25,000.00 |
| 06/30 | 06/30 Online Domestic Wire Transfer Via: Wells Fargo NA/121000248 A/C: Aba/121042882 Concord CA US Ben: Profuse Studio LLC Sun Valley CA 91352 US Ref:/Time/05:28 Imad: 0630B1Qqq03C001280 Tm: 318285318iEs | 20,000.00 |
| 06/30 | 06/30 Online Payment 17741595098 To Olympus Axv Solutions Inc | 24,580.99 |
| 06/30 | 06/30 Online Payment 17741595095 To Mass Exclusive LLC | 22,750.85 |
| 06/30 | 06/30 Online Payment 17741595084 To Cm General Auto Electric Supplies,Inc. | 19,680.75 |

53.    The JPMC 0835 bank statements further showed online transfers totaling $50,000 to SHAW's shell, Prime, that he used to fraudulently obtain a PPP loan as more fully described in Exhibit A.

---

[11]    One such "online payment" on June 29, 2023 was to "Alpha Omega Solutions LLC" for $10,280.95.  I know from my investigation that Alpha Omega Solutions LLC was a shell whose account signatory was ARSEN TERZIAN, aka Steven Terzaki. TERZIAN is a SUBJECT in the concurrently submitted complaint and affidavit against SUBJECT SHAW.  (See Exhibit A).

54.    Within approximately four weeks, substantially all of the Dynamic PLP loan proceeds (more than $2.7 million) were transferred out via online transfers to the same shells that I have repeatedly noticed in this case were used to "layer" fraudulently obtained loan proceeds.

55.    Finally, bank records from the JPMC 0835 show that, between July 3 and 31, 2023, MARK signed bank withdrawal slips (the signature on the slips matched that of his driver's license and the signature card for the JPMC 0835) for nine separate cash withdrawals of $4,500.  I also know from my training and experience that breaking up cash withdrawals in this way is consistent with structuring to avoid reporting cash activity to the IRS.  I therefore have probable cause to believe, based on the totality of the evidence regarding the Dynamic PLP transaction and others described below, that these withdrawals represented MARK's personal cut of fraudulently obtained and laundered proceeds.

### H.    SUBJECTS MCGRAYAN, MARK, and MUSAYELYAN: Wire Fraud, Bank Fraud, and Money Laundering RE "GDI" PLP Loan

56.    I reviewed a PLP loan file from First Internet Bank of Indiana ("FIBI") involving SUBJECTS MGGRAYAN, MARK, and MUSAYELYAN.  I learned the following that indicated that MCGRAYAN, MARK, and MUSAYELYAN committed wire fraud and money laundering in substantially the same manner as with the Dynamic PLP, described above:

a.    A November 2023 standard form "Business Purchase Agreement" for MARK's purported business, "Global Dynamic IT"

40

("GDI"), to buy MUSAYELYAN's' purported business, "Global Ultimate Management" ("GUM"), for $3,650,000.  The agreement stated that the purchase price was to be paid by a $550,000 cash deposit and a PLP for $3,100,000 ("the GDI PLP").

b.   Like the Dynamic PLP deal between SHAW and MARK, MCGRAYAN was the broker who stood to receive a commission of tens of thousands of dollars.

c.   MARK's identity as the authorized representative of GDI was established by, at least: (1) a photocopy of the genuine driver's license for MARK as requested by FIBI; (2) a "non-identity affidavit" with MARK's true date of birth, Social Security number, and residence address that contained what appeared to be a live ink signature above what appears to be a notary jurat and signature of a notary who authenticated MARK's signature; (3) a "personal financial statement" that identified MARK by what I have verified by law enforcement databases and other loan documents to be his then personal residence; (4) a "beneficial ownership" statement that contained not only a substantially identical live ink signature that matched that of MARK's driver's license but also contained his true date of birth, driver's license number, and Social Security number; and (5) a "personal eligibility questionnaire" that contained not only a substantially identical live ink signature that matched that of MARK's driver's license but also contained his true date of birth, driver's license number, Social Security number, and an electronic "DocuSign" signature for "Axle MARK" next to his live ink signature.

d.   A "management resume," bearing MARK's true date of birth, Social Security number, personal residence address, and a live ink signature of MARK that matched that of the other, above-described GUM PLP loan documents and also bore the DocuSign signature of MARK, stated that MARK worked for "Oncore, Inc." from 2012 to 2017 as "IT manager" to "handl[e] technical support on daily basis."  As mentioned above, I spoke to H.A., who identified himself as a co-owner of Oncore Inc.  He told me that MARK was employed by Oncore Inc. for about a year, not as an "IT Specialist" but as a "dispatcher."  A "resume" that SHAW had provided in connection with the Dynamic PLP, described above, similarly misrepresented that SHAW had the identical position at Oncore Inc. ("IT Specialist – Handling Technical Support on Daily Basis") and, as described above, an Oncore Inc. representative told me that SHAW never worked at Oncore Inc.

e.   MARK's "management resume" also claimed his work experience as "president" of Dynamic Delivery Install, Inc. from 2017 to 2023.  I know from reviewing a duly subpoenaed loan file from the Federal National Mortgage Association that, in June 2019, MARK applied for a loan to buy his personal residence (the same residence that he later identified on numerous loan and related documents in this investigation).  On his loan application, MARK stated that, as of June 2019, he had been employed as a "load salesman" for six years at $2,197/month.  He mentioned nothing about Dynamic Delivery Install, Inc., or his purported work in "IT."  Thus, as stated above, I have probable cause to believe that Dynamic Delivery Install, Inc. was a shell

that was created or at least used for the sole purpose of supporting the fraudulent application for the Dynamic PLP loan.

       f.   I also know from my training and experience that FIBI, like other PLP lenders, required that a PLP borrower, here GDI, submit proof of seasoned good faith deposit funds. Similar to how SHAW submitted fake bank statements to qualify for the Dynamic PLP, discussed above, so too MARK submitted fake bank statements to fraudulently obtain loan approval. From reviewing the FIBI loan file, I learned that:

       i.   The file contained a purported bank statement for a JPMC account ending in 1343 (the "JPMC 1343") in the name of MARK at the same residence address that MARK provided on other loan documents (the "MARK Statement").

       ii.   For the period of September 1 through 29, 2023, the MARK Statement showed a beginning balance of $805,002.02.

       iii.   I obtained genuine records for the 1343 Account from JPMC via subpoena. I compared those genuine records to the Mark Statement (for the same period (September 1 through 29, 2023)) and learned that the beginning balance on the genuine statement was actually $5,002.02, or $800,000 less than the MARK Statement. The Mark Statement (i.e., the fabricated statement is on the left, below, and the genuine statement is on the right):



iv.    I also noticed that the inflated number (appx. $800,000) on the MARK Statement was substantially identical to the inflated number on SHAW's fake bank statements that he had provided in connection with fraudulently seeking the Dynamic PLP loan, described above, in which MARK was the sole owner of the purported (but fake) seller.

g.    FIBI, like GB, required tax returns from the seller to establish that the seller, GUM, had genuine revenue to support its valuation for the purpose of justifying the purchase price in the purchase agreement.  I reviewed GUM's tax returns that, like the Dynamic PLP, were prepared by A.M.  A.M. had told me that MCGRAYAN referred several clients to him to prepare tax returns for the purpose of the clients' (or their "entities") applications for loans.  A.M. recalled preparing the GUM returns.  These returns described millions in revenue and, over the period of three tax years, whose returns were prepared at the same time, and were untimely as to at least the first two years, reported over a hundred thousand dollars in tax due and owing.  Based on A.M.'s and F.N.'s statements, and the totality of the evidence gathered in this investigation, I have probable

cause to believe that GUM's tax returns were fraudulent and submitted solely to defraud FIBI.

h.    The GDI PLP was funded on February 23, 2024.  Net loan proceeds of $3,497,426 were disbursed by check no. 150376 payable to "Global Ultimate Management" and mailed to 6615 Hazeltine Avenue, Unit 103, Van Nuys, CA 91405, an address that I know from law enforcement databases was at that time MUSAYELYAN's personal residence.

**I.    SUBJECTS MCGRAYAN, HARVARD, and DIAMONDZ: Wire Fraud, Bank Fraud, and Money Laundering re "OAS" PLP Loan**

57.    I reviewed records from Byline Bank and learned the following:

a.    A May 2021 purchase agreement described "John Harvard, Olympus AXV Solutions, Inc." ("OAS") as the purchaser of the assets of "American Best Filter, Inc." for $2,600,000.  I believe that SUBJECT HARVARD signed this agreement because the signature bearing his name matched that of his genuine driver's license and his notarized signature on other documents associated with this transaction.

b.    The seller's signature line identified the seller as "Mery Diamondz D/B/A American Best Filter, Inc" ("ABF") who signed the agreement on May 17, 2021.  The signature appeared to be a live ink signature of SUBJECT DIAMONDZ whose signature I recognized as matching that of DIAMONDZ's genuine driver's license and multiple bank account signature cards bearing her signature and identifying her by her true date of birth, Social Security number, and driver's license number.

c.   The transaction was, like substantially all of the fraudulent PLPs in this investigation, brokered by MCGRAYAN who stood to receive a commission of several thousand dollars.

d.   HARVARD represented that OAS intended to purchase the assets of ABF to "expand its operations" and that OAS was presently engaged in "provid[ing] commercial/ residential/ industrial water filtration and water softener systems, primarily in the Los Angeles area."  Consistent with the totality of the evidence gathered in this investigation, I believe OAS was merely a shell that was neither engaged in any such business nor did it intend to expand any business into the stated subject area or any other.

e.   The loan file contained an office lease agreement dated November 1, 2021, for $500/month "to terminate on October 31, 2026."  Based on my observation of other leases for similar, small spaces, made at or close to applying for PLPs, I believe that the lease was fake and made with the intent to defraud Byline Bank.  No less, the lease did not identify OAS as the occupant; the occupant, identified in several places on the lease, including just above what appeared to be HARVARD's genuine, live ink signature, was "American Olympus Solutions, Inc.," what I believe to be yet another shell held by HARVARD.

58.   In April 2025, I visited and photographed the building area where HARVARD claimed that OAS operated and saw no references to OAS's occupancy.  I believe that was consistent with fraudulent statements and documents submitted to obtain the PLP as well as with documents in the Byline Bank file that

stated that the entire amount of the loan that was guaranteed by the SBA ($1,739,589) loan was "charged off" in part because a "Site Visit conducted on 12/19/2023 during "regular" business hours indicated the business was not open, doors locked, and no lights were on."

59.    The purchase agreement for the OAS PLP stated that ABF did business at 345 W. Foothill Blvd., Suite 5, Glendora, CA.  The Byline file contained a copy of a lease agreement for that space that stated that ABF had taken tenancy in November 2021 (the same month that OAS had purportedly signed its lease for its space).  I spoke to R.N., who told me that her father, P.N. had owned the building at that time and that he died of Alzheimer's disease in June 2021, or several months before the lease was signed that bore his signature.  R.N. reviewed the lease and told me that the lease was fake because her father did not, and could not, due to his death, sign the lease.  R.N. said that she was familiar with the tenants in the building and knew nothing about ABF.

60.    In April 2025, I photographed the outside of the office space that was identified in the fake lease as ABF's office.  The image that I took, below, depicted "American Best Filter, Inc." on the left window and "Canmar Promo Corp, Inc." Each was a shell and each lease was fake.  (Canmar Promo Corp, Inc. is the subject of another fraudulent PLP, described below.) Furthermore, neither space seemed consistent with that of the operation of businesses that claimed millions in income by for

47

selling water filtration equipment (ABF) or offering vague "marketing" services (Canmar).



61.    The Byline Bank file also contained what appeared to be a genuine notarized, live ink signature of HARVARD on November 2021 in support of a guarantee of OAS's PLP obligation. I have probable cause to believe, based on that and the totality of the evidence described herein, that HARVARD knowingly participated in the scheme to defraud Byline Bank.

62.    Records for Bank of America account ending in 3882 (the "BofA 3882") show the following:

a.    The signature card/account opening application was signed on May 12, 2020 at an Encino branch of Bank of America.  The signature card indicated that the account holder signed the signature card before a Bank of America employee on that same date.  The signature matches that of DIAMONDZ's driver's license.  Based on F.N.'s statement and the totality of the evidence in this case, I have probable cause to believe that DIAMONDZ actually signed this signature card (and that of

several other cards for accounts that she opened around the same time) at MCGRAYAN's direction, knowing that doing so was to obtain loans that, at the least, were suspicious if not fraudulent.

b.    The proceeds of the OAS PLP, $2,139,941, were deposited to the BofA 3882 on November 12, 2021.  The prior, existing balance was $64,250.

c.    Approximately $2 million, in the form of six checks, ranging from $205,000 to $450,501, was withdrawn from the BofA 3882 within three days of the deposit of the PLP proceeds.  Five checks were written to "American Best Filter, Inc." and one was written to "Mery Diamondz."  Each bore a signature that matched that of DIAMONDZ's driver's license and the signature card for the 3882 Account.  The printing on the checks did not appear to match that of DIAMONDZ on at least one other check that bore DIAMONDZ's signature.  Based on F.N.'s statement and the totality of the evidence that I have reviewed in this investigation, I believe that MCGRAYAN, or someone acting at his direction, wrote out each such check and either directed DIAMONDZ to sign each check or obtained pre-signed checks from DIAMONDZ.

d.    One of the checks, for $450,501, was deposited into a Wells Fargo account in the name of "American Best Filter, Inc." and ending in 7536 (the "WF 7536").  I reviewed WF 7536 records and learned from the signature card/account application that the WF 7536 was opened by DIAMONDZ seven days before the

BofA 3882, as her signature, date of birth, Social Security number, and driver's license matched that of DIAMONDZ.

   e.   I further reviewed the account statements for the WF 7536 over approximately six months to trace the flow of the $450,501 check that had come through the BofA 3882 from the proceeds of the OAS PLP and learned that just under $75,000 was transferred (in two payments, one for $25,000 and the other for $49,800), online, to "Zart Art Printing," and $49,805 to "CP Mobile Mechanic, Inc.," also online, and each a shell whose accounts were opened around the same time, and in manner consistent with, that of the shell accounts opened by F.N. and DIAMONDZ to obtain loans.

   f.   In August 2022, and continuing monthly thereafter for approximately 12 months, the WF 7536 was used to layer funds, i.e., launder funds received from and, commonly in the same billing cycle, paid to, the same shells whose accounts were repeatedly used to layer funds.

63.   A.M. told me that he met DIAMONDZ, for whom he prepared ABF tax returns, who signed the returns and told him that she that she was in the water filter business.

   **J.   SUBJECTS MCGRAYAN, BENJAMIN, AND AYDI: Attempted Wire Fraud and Bank Fraud re "Alex Titan Solutions" PLP Loan**

64.   I have probable cause to believe that MCGRAYAN, BENJAMIN, and AYDI attempted to commit wire fraud and bank fraud against First Citizens Bank in North Carolina ("FCBNC") by making false statements and submitting fraudulent documents to seek a $3 million PLP.  The PLP was denied.

65.    I obtained from FCBNC a loan file for a PLP for borrower "Alex Titan Solutions, Inc.," and learned the following:

a.    In January 2025, FCBNC received online an application for a PLP for $3 million for "Alex Titan Solutions, Inc.," acting through its owner, BENJAMIN, to buy the assets of "Titan Solutions, Inc.," acting through its owner, AYDI.  The purchase price included $2.6 million for the seller's assets and $275,000 for working capital.  The seller's stated current accounts receivable were $197,000.  BENJAMIN's true name, date of birth, and then-residence address in connection appear on the PLP application.

b.    The purchase agreement was dated October 14, 2024, brokered and signed by MCGRAYAN, and the escrow was handled by Escrow Officer 1 at Escrow 1.

c.    The file contained a 2023 IRS Form 1120 corporate tax return for "Titan Solutions, Inc." dated May 6, 2024, bearing a signature purportedly of AYDI, and reporting $2.8 million in revenue, $817,783 in taxable income, and more than $50,000 tax due and owing.  Although I did not further investigate this return because there was substantial, other evidence that this loan was fraudulent, I have probable cause to believe that the return was, in fact, fraudulent as it was consistent with the other fraudulent returns described herein.

d.    The loan file contained a copy of a lease for AYDI's business to be sold for $3 million, a small office space on Green street in Pasadena (the "Green Street Office").  The

Green Street Office lease was written in June 2024, for one year at monthly rent of $638.

66. I interviewed T.T. who told me the following:

a.    She is a realtor in the Pasadena area who advertises heavily in the Armenian community.

b.    She received a call around early June 2024 from an individual seeking to rent a small office in Pasadena.  She assembled five or so listings, including one for the Green Street Office, and emailed them to the caller whose named she could not recall.  T.T. arranged to meet the caller at one of the listings and to then caravan to the others.

c.    She met two individuals at the first of the listings.  She claimed that she could not identify either of them.  She showed them the Green Street Office and they selected it because it was the cheapest rent.

d.    T.T. obtained a lease application from the lessor of the Green Street Office and forwarded that to the email address that she received from one of the individuals whom she met during the caravan/showings.  T.T. said she received a commission for her work, in an amount she could not recall, and that she values her reputation in the community of largely Armenian clients.  I showed T.T. a picture of AYDI.  T.T. claimed that she could not recall meeting him.

e.    Other than meeting the two individuals at the Green Street Office to show them that space (and four others during that same time), T.T. communicated with the prospective

52

tenant(s) by email.  T.T. received from one of the two
individuals the following:

        i.   An "Application" for the Green Street
Office in the name of AYDI with AYDI's true Social Security
number, date of birth, and driver's license, contained a
signature at the bottom of the application in the same printing
and writing instrument (what appeared to be a "sharpie" or
similar instrument) that matched that of AYDI's driver's
license.  I therefore have probable cause to believe that AYDI
executed the lease application and will refer to it as such.

        ii.   AYDI stated in the Application that he was
the "president" of "Titan Solutions," the name of the business
to purportedly be sold.  He gave its business address as the
same as his stated residence address, an apartment in Valley
Village, CA.  AYDI claimed that he had earned a monthly salary
from Titan Solutions, since December 2018, of $16,000.

        iii. AYDI also emailed with the lease application
several other documents including purported financial statements
for Titan Solutions.  One such purported financial statement was
an income statement for Titan Solutions that I believe to be
fabricated, using Quickbooks or one of many open source
programs, based on my review of numerous other, similar, and
bogus financial statements gathered in this investigation.

        iv.   AYDI also emailed "Articles of
Incorporation" for "Titan Solutions Inc." in California, dated
September 2018.  There was no reference to AYDI or anyone
associated with this investigation.  The corporate agent for

service of process was "Registered Agents Inc."  Based on my

training and experience and the evidence gathered in this case,

I believe that these corporate articles were obtained or

purchased by MCGRAYAN and held as a shell for future use to

fraudulently obtain loans.

          v.    AYDI also emailed a "Statement of

Information" ("SOI") for "Titan Solutions" dated April 22, 2024,

that identified AYDI as the sole officer and director from the

same residence address that AYDI stated in the lease application

for the Green Street Office, and that was e-signed by AYDI.  I

know based on my training and experience that, under California

law, a corporation must file an SOI within 90 days of

incorporation and then annually, and that failure to file SOIs

may result in suspension.  I reviewed records of the California

Secretary of State and learned that no SOI was filed for Titan

Solutions until April 22, 2024, and that it was suspended until

April 2023.  Based on this information, F.N.'s statements, and

on the totality of the evidence described herein, I have

probable cause to believe that MCGRAYAN directed AYDI to sign

and/or submit this SOI to "revive" the otherwise dormant Titan

Solutions shell to create the appearance that it was a

legitimate business solely for the purpose of fraudulently

obtaining the PLP.

          f.    ADYI also emailed T.T. copies of JPMC bank

statements for an account in the name of Titan Solutions Inc.

ending in 0153 (the "JPMC 0153"), apparently to show that Titan

Solutions was a going concern with legitimate income.  I

reviewed records for that account and learned that the JPMC 0153 was not used for legitimate business activity but, instead, like the other shell accounts described herein, for money laundering:

      i.    ADYI opened that account on May 11, 2023, using his true name, Social Security Number, and residence address (the same address he used on the Green Street Office lease application).  The first deposit was a $100 cash and a check from one of the numerous shell entities, opened by SUBJECT VACHYAN in the name of "Art Mart" for $9,670.99, an amount that, based on my training and experience and the evidence gathered in this case, was evidence of intent to structure and layer ill-gotten gains.[12]

      ii.    Between its opening in May 2023, and when AYDI provided JPMC 0153 statements to E.L., the Green Street Office landlord's representative, the account was used solely to launder money in a nearly identical manner to that of numerous other accounts opened by SUBJECTS by receiving the deposit of checks from shells and then withdrawing and sending those same funds to those same and other similar shells' accounts in the names of other SUBJECTS.

67.  I interviewed A.S. who told me that she is a loan officer at FCBNC and is familiar with the Titan PLP loan file. A.S. told me that FCBNC ordered a site visit of the Green Street Office as part of loan underwriting and that she told BENJAMIN that he needed to be present during the site inspection.  A.S.

---

[12]  The offense conduct involving VACHYAN and his shell, "Art Mart," is discussed below.

told me that BENJAMIN told her that Titan Solutions did not
occupy the space because it was being "fumigated."

    68.    I interviewed E.L. who told me the following:

        a.    He is the representative for the owner of the
building for the Green Street Office.

        b.    He negotiated the lease for the Green Street
Office regarding Titan Solutions.

        c.    The tenant never actually moved into the space.

        d.    (Contrary to what BENJAMIN told A.S., the loan
underwriter), the space was never fumigated.

**K.    SUBJECTS MCGRAYAN, ANAHIT, AND PARKER: Wire Fraud,
        Bank Fraud, and Money Laundering re "Canmar" PLP Loan**

    69.    I reviewed a PLP loan file from Ameris Bank
("Ameris") and have probable cause to believe that MCGRAYAN,
ANAHIT, and PARKER committed wire fraud and bank fraud by making
fraudulent statements and submitting fraudulent documents to
qualify for more than $2 million in PLP funding, and then
laundered the proceeds through shell accounts.

    70.    I reviewed the Ameris loan file and learned the
following:

        a.    A January 2023 asset purchase agreement purported
to show that ANAHIT's corporation, Canmar Promo Corp ("Canmar"),
agreed to buy the assets of PARKER's purported company, "Mass
Exclusive," for $2,905,000, in the form of a $750,000 cash
downpayment and a $2,155,000 loan.  MCGRAYAN was the broker and
the escrow was handled by Escrow Company 1 and Escrow Officer 1.
MCGRAYAN stood to receive a 1% "referral fee" of $22,500

according to the escrow instructions and an invoice that
MCGRAYAN's business sent to the lender, but I have probable
cause to believe that MCGRAYAN received millions through the
laundering of the loan proceeds via shell accounts.

      b.    A "management resume" was submitted to Ameris for
ANAHIT as part of the underwriting process.  The resume stated
that ANAHIT, a late '60's woman of Armenian descent, had managed
Canmar as a promotional and apparel business since 2015.  The
resume also stated that ANAHIT had worked for "So Cal
Promotions" in Yorba Linda from 2007 to 2015 as a "promotions
manager."  I conducted an online search of So Cal Promotions and
found it to be a genuine promotional and apparel business in
Yorba Linda.  https://www.socalpromotions.com/.  In April 2025,
I spoke to J.S., who told me that he is the owner of So Cal
Promotions in Yorba Linda.  He stated that he remembers the
names of every employee from 2007 to 2015 and, when told that
ANAHIT had listed So Cal Promotions on her resume, J.S. said he
had "never heard of her" and "she's pulling your leg."

      c.    Escrow instructions allocated the purchase price
as follows: "Furniture, Fixtures & Equipment - $125,000.00,"
"Goodwill - $580,000.00," and "Covenant Not to Compete -
$2,200,000.00."  I know from my training and experience that the
value placed on a "covenant not to compete" is oftentimes
considered equivalent to the claimed asset value of a service
business for purposes of underwriting a loan to buy a service
business.  Based on the totality of the evidence relating to
this transaction and that of the other PLP transactions

described herein, I have probable cause to believe that these figures were entirely made up with the intent to defraud because Mass Exclusive was yet another valueless shell.

71.    Ameris required that Canmar have a minimum 10-year office lease.  The lender's "closing checklist" showed that Canmar had to provide a copy of that ten-year building lease and that Canmar subordinate its interest in that lease space as collateral for the PLP.   I showed R.N. a copy of the lease for Canmar's office space that was provided to Ameris.  The lease bore ANAHIT's signature that matched that of her driver's license.  As stated above, R.N. told me that her father, P.N., had owned the building but had died in June 2021 of Alzheimer's disease.  R.N. told me that she is familiar with P.N.'s signature and that, having reviewed the lease, R.N. determined that P.N.'s signature was forged, as was P.N.'s signature on the "subordination" agreement, because P.N. had died in 2021, two years before both documents were purportedly executed in 2023.

72.    Ameris's "vetting memo" contained a detailed spreadsheet that evaluated Canmar's creditworthiness based on its federal income tax returns.  Copies of Canmar's returns for calendar years 2020 and 2021 were included in the loan file and, according to the "closing checklist," they were provided on behalf of the borrower.  IRS transcripts that appear to be genuine were also included in the loan file.  I reviewed those documents and made these observations:

a.    The transcripts showed that the tax returns were not timely filed.  The 2020 tax return was filed on May 16,

2022, or just before the Canmar PLP loan was sought.   The 2021 tax return was filed on February 13, 2023, or during the loan underwriting process (actually, just a few weeks before the loan was approved and funded).

b.    Each return was prepared by A.M.   As stated above, A.M. stated that he received numerous client referrals from MCGRAYAN to prepare tax returns to support loans.   A.M. identified ANAHIT as one such client.   A.M. said that he verified ANAHIT's identity by obtaining from her a photocopy of her driver's license and Social Security card in connection with using the Docusign authentication platform.   A.M. provided copies of those identity documents to me and I confirmed via law enforcement databases that they were genuine and for ANAHIT.

c.    A.M. also provided a copy of this email order to prepare Canmar's tax return:



73.    Ameris's records included a wire transfer memo showing that loan proceeds of $2,242,761 were wired from the closing agent (a law firm in Boca Raton, FL) to City National Bank in Los Angeles FBO Escrow Company 1 on March 14, 2023.   On March 15, 2023, Escrow Company 1 wrote and mailed a check for

the Canmar PLP proceeds.  I traced that check to a Wells Fargo account ending in 0655 (the "WF 0655") and learned the following:

        a.   The Canmar PLP proceeds check was deposited into the WF 0655 on March 16, 2023.

        b.   The WF 0655 was opened on June 10, 2020, or around the same time that numerous other shell accounts were opened by other SUBJECTS at, based on the totality of the evidence in this case, at the direction of MCGRAYAN for the sole purpose of fraudulently facilitating loans.

        c.   The signature card/account application stated that PARKER was the "owner with control of the entity" of Mass Exclusive, further stated his true date of birth, Social Security number, and driver's license, and further indicated that PARKER's identity at the time of opening the account was determined upon the bank employee's review of PARKER's Social Security card and driver's license.  I compared the signature on that card to that of PARKER's driver's license and believe that they were signed by one and the same person.  Again, I have probable cause to believe that PARKER personally opened this account at MCGRAYAN's direction, knowing or having the strong suspicion that the account was to be used solely to fraudulently obtain loans.

        d.   The activity in the WF 0655 was entirely consistent with the money laundering "layering" activity in the numerous other accounts described in this affidavit, including showing transfers from that account in amounts consistent with

the transfers by and between shells' accounts and then deposits from the same shells, as shown in these excerpts from the March 2023 WF 0655 statement:



74.    Substantially all of the Canmar PLP proceeds were transferred out of the WF 0655 to other shells' accounts within less than 60 days with several interspersed $1,000 ATM cash withdrawals that I have probable cause to believe were, in whole or in part, ANAHIT's cut of the fraudulent proceeds.

**L.    SUBJECTS MCGRAYAN and STAVROS: Attempted Wire Fraud and Bank Fraud re "Stavros Auto Group" PLP Loan**

75.    I have probable cause to believe that MCGRAYAN and STAVROS attempted to obtain nearly $3 million in PLP funds by using fabricated bank statements that were substantially similar to the fabricated bank statements submitted for the Dynamic PLP and GDI PLP frauds, described above.

76.    I reviewed a loan file from First Internet Bank of Indiana ("FIBI") and learned the following:

61

a.   In June 2024 FIBI received a written inquiry to make a PLP on behalf of "Stavros Auto Group Inc." for $2,855,000 to purchase a business to be designated.  The loan was not ultimately funded.

b.   An individual identified as STAVROS signed and e-signed FIBI's "personal eligibility questionnaire" that required that he provide and certify personal identifying information. The document had STAVROS's true Social Security number and date of birth.  His live-ink signature matched that of his genuine driver's license.  FIBI's file also contained a color photocopy of STAVROS's "Passport Card," with his photo that matched that on his driver's license, which I verified through law enforcement data basis to be genuine.  I will, therefore, hereafter refer to STAVROS as the borrower.

c.   STAVROS represented to FIBI that he currently operated "Stavros Auto Group Inc." under the fictitious business name of "Tru Sight Auto Group" at 17425 Chatsworth St., Suite 102-B, Granada Hills, CA 91344.[13]

d.   To satisfy FIBI's inquiry that STAVROS show seasoned funds for the $345,000 cash "injection" (i.e., downpayment), STAVROS sent FIBI a photocopy of a statement for a US Bank account ending in 1844 (the "USB 1844") for the period of July 13 through August 13, 2024.  The statement identified the account holder as "Samuel Stavros" at 17425 Chatsworth St.,

---

[13]  I know from my investigation that this address has been fraudulently used by Arsen Terzian, aka Steven Terzaki, whose offense conduct is described in the concurrently submitted complaint and affidavit for a warrant for his arrest. (*See* Exhibit A.)

Suite 102#B, Granada Hills, CA," account ending in 1844 (the "USB 1844"). The statement showed a beginning balance of $48,954 and a deposit of $490,000 on August 13, 2024.

e.    I obtained genuine bank statements from US Bank for the USB 1844. I learned the following:

i.    STAVROS opened the account on August 17, 2020, using is true Social Security number and date of birth. His signature matches that of his driver's license. The account was opened around the same time as that of several other shells (or, in this case and in F.N.'s case, individually but, similarly, at the direction of MCGRAYAN).

ii.    For the same period (July 13 through August 13, 2024), the genuine statement showed a deposit on August 13 for "90,000," (the genuine statement did not have a "dollar" sign directly in front of that number). The statement that had been provided to FIBI in support of the PLP request showed a deposit on the same date of "490,000," evidencing that a fabricated statement had been provided to FIBI. The fabricated statement (on the left) and the genuine statement (on the right) are compared below:



**M.    SUBJECTS MCGRAYAN and MUSAYELYAN: False Claim, Wire Fraud, and Money Laundering re GUM EIDL**

77.    I have probable cause to believe that MCGRAYAN and MUSAYELYAN schemed to defraud the SBA through fraudulent representations and fraudulent documents to obtain an EIDL on behalf of MUSAYELYAN's shell, GUM, the same shell that was three years later involved in the GDI PLP fraud, and then laundered the proceeds in an identical manner.

78.    I reviewed SBA files for the GUM EIDL and learned the following:

a.    On March 30, 2020, within a week of the nationwide Covid-19 lockdown, a EIDL application for $139,000 was submitted for GUM.

b.    Like substantially all of the hundreds of EIDL files I have reviewed, the application was submitted via SBA's online portal. The application identified MUSAYELYAN as the applicant's contact and stated that he was GUM's "CEO," that GUM was engaged in "retail" business activity, and that MUSAYELYAN was GUM's "100%" owner. The application further provided

64

MUSAYELYAN's true date of birth, Social Security number, and the same residence address to which the GUM PLP loan proceeds were mailed years later, as described above.

c.     The EIDL application claimed that GUM was established in 2008, that its 2019 gross revenues were $845,000, and that the EIDL proceeds should be wire-transferred to a JPMC account ending in 8927 (the "JPMC 8927").

d.     A person who identified himself as MUSAYLEYAN signed the standard form Loan Authorization and Agreement ("LA&A") via the DocuSign online authentication platform on May 30, 2020, in which he represented that GUM would, in pertinent part, "use all the proceeds of this [l]oan solely as working capital to alleviate economic injury caused by disaster occurring in the month of January 31, 2020[.]"

e.     I obtained from JPMC via subpoena, and reviewed, genuine records for the JPMC 8927 and learned the following:

i.     The GUM EIDL proceeds ($138,900, net of fees) were deposited into that account on June 8, 2020, as shown by this excerpt from a genuine account statement:



f.    The beginning balance for that period (May 30 to June 20, 2020), shown above, was $17,633.  The balance beyond the deposit of the EIDL proceeds substantially consisted of deposits of electronic checks from a variety of the same shells that I have observed were the payors and payees of hundreds of instances of money laundering "layering" throughout this case. Below is a sampling of the deposited checks from shells:



g.    Many of the deposits were in odd amounts within $1,000 or so, or less, of $10,000, indicating, based on my training and experience, that the parties to the transactions broke up the deposits to avoid reporting the transactions to the IRS.

h.    Consistent with the numerous other money laundering/layering transactions described in this affidavit, substantially all of the EIDL proceeds were laundered by online withdrawal transfers to accounts in the names of other shells, as shown by an excerpt of the JPMC 8927 statement for the period in which the EIDL proceeds were deposited:

**ELECTRONIC WITHDRAWALS**

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 06/05 | Orig CO Name:T Mobile        Orig ID:0000450304 Desc Date:200605 CO Entry Descr:Pcs Sec:Web   Trace#:021000029686628 Eed:200605  Ind ID:7702120           Ind Name:Taron Musayelyan | $70.00 |
| 06/08 | 06/09 CO Name:American Express   Orig ID:9493560001 Desc Date:200608 CO Entry Descr:ACH Pmt  Sec:CCD   Trace#:021000024593469 Eed:200608  Ind ID:A8772 Ind Name:Taron Musayelyan | 67.00 |
| 06/09 | 06/09 Online Payment 9750715467 To Cm General Auto Electric Supplie | 5,102.48 |
| 06/09 | 06/09 Online Payment 9750715463 To American Best Filter Inc | 4,898.45 |
| 06/09 | 06/09 Online Payment 9750715479 To 911 Janitorial Services LLC | 4,700.57 |
| 06/09 | 06/09 Online Payment 9750715531 To Nobel Event Planners | 6,402.48 |
| 06/09 | 06/09 Online Payment 9750715515 To Global 6 Solutions | 5,501.55 |
| 06/09 | 06/09 Online Payment 9750715523 To Mobile Auto Repair Inc | 4,789.64 |
| 06/09 | 06/09 Online Payment 9750715509 To Cp Mobile Mechanic Inc | 4,650.12 |
| 06/09 | 06/09 Online Payment 9750715526 To Select Business Solutions Inc | 6,740.99 |
| 06/09 | 06/09 Online Payment 9750715536 To Optimal Business Solutions LLC | 5,200.38 |
| 06/09 | 06/09 Online Payment 9750715554 To Orbit Merchants | 4,120.88 |
| 06/09 | 06/09 Online Payment 9750715574 To Zart Art Printing Inc | 5,102.65 |
| 06/09 | 06/09 Online Payment 9750715572 To Shoreline Stone LLC | 4,930.40 |
| 06/09 | 06/09 Online Payment 9751169552 To Znart | 200.00 |
| 06/11 | 06/10 Basic Online Payroll Payment 5252536880 To #####2739 | 3,452.40 |
| 06/11 | Orig CO Name:Patriot Software     Orig ID:1815426696 Desc Date:200611 CO Entry Descr:Payroll  Sec:CCD   Trace#:044000024384133 Eed:200611  Ind ID:P2664493 Ind Name:Global Ultimate Manage | 3,204.76 |
| 06/15 | 06/13 Online Payment 9773705594 To American Best Filter Inc | 5,348.20 |
| 06/15 | 06/13 Online Payment 9773705588 To 911 Janitorial Services LLC | 5,130.40 |
| 06/15 | 06/13 Online Payment 9773705599 To Cm General Auto Electric Supplie | 4,990.11 |
| 06/15 | 06/13 Online Payment 9773705610 To Cp Mobile Mechanic Inc | 5,300.69 |
| 06/15 | 06/13 Online Payment 9773705614 To Global 6 Solutions | 5,220.47 |
| 06/15 | 06/13 Online Payment 9773705630 To Mobile Auto Repair Inc | 5,085.64 |
| 06/15 | 06/13 Online Payment 9773705621 To Mass Exclusive LLC | 4,580.64 |
| 06/15 | 06/13 Online Payment 9773705665 To Select Business Solutions Inc | 7,001.59 |
| 06/15 | 06/13 Online Payment 9773705637 To Nobel Event Planners | 5,900.55 |
| 06/15 | 06/13 Online Payment 9773705658 To Optimal Business Solutions LLC | 5,604.31 |

79.    None of the transfers either into or out of this account, both before credit for the EIDL proceeds or after, were consistent with the required use "solely as working capital to alleviate economic injury caused by disaster occurring in the month of January 31, 2020[.]"

**N.    SUBJECT MUSAYELYAN: False Claim, Wire Fraud, and Money Laundering re Personal EIDL**

80.    On June 30, 2020, an EIDL application for $150,000 was submitted for MUSAYELYAN doing business as "Global Ultimate Systems" (the "GUS EIDL").  The application was submitted via SBA's online portal.  The application identified MUSAYELYAN as the applicant's contact by his phone number at the same residence address for MUSAYELYAN for the GUM EIDL, described above.  The application further stated that GUS was a sole proprietorship of MUSAYELYAN, that GUS was established in 2018, and that its 2019 gross revenues were $1,258,900.

81.    The GUS EIDL was funded on July 2020 for $149,900 (net of $100 fees).  I reviewed US Bank records for an account ending in 4221 (the "USB 4221") and learned the following:

a.   MUSAYELYAN was the sole signatory and electronically opened the account September 2018.

b.   The EIDL proceeds were deposited into the USB 4221 Account on July 27, 2020.  The preceding balance was $11,723.

c.   Approximately $120,000 in checks were written against the USB 4221 Account within 60 days of the EIDL deposit, including nearly $80,000 within less than 30 days, many in odd amounts just under $10,000.  These checks were, as I have observed in several other accounts as part of this investigation, consistent with the intent to structure.  Other deposits were substantially *de minimus* and not consistent with regular business income.

82.   I know from my training and experience that EIDL borrowers frequently sought EIDL modifications to obtain more money related to the same business and based on the initial EIDL application's representations.  While initial EIDLs were approved primarily on the basis of information stated by the borrower or borrower's authorized representative, the SBA required that EIDL modification applicants provide more information and documentation to support their applications. Such documents commonly included government-issued identification documents and documents to verify income or financial condition such as genuine federal income tax returns.

83.   In October 2021, an application was submitted to increase (modify) the GUS EIDL by $788,800.  The SBA file for the modification contained the following:

68

a.    Images of a driver's license and passport for MUSAYELYAN that I matched those identifiers in law enforcement databases.

b.    An SBA Form 413 "Personal Financial Statement" that I am familiar with and I know was commonly required by SBA for borrowers seeking EIDL modifications.  Above the signature that matched that of MUSAYELYAN's driver's license and passport, and which stated his true Social Security number, the statement claimed MUSAYELYAN's annual salary was $229,434.

84.    The Loan Agreement & Authorization ("LA&A") for the EIDL modification that was signed electronically by "Taron MUSAYEYLAN" on January 5, 2022.

85.    I know that the standard form "Rapid Finance Application" for EIDLs includes a "Note" section that chronologically logs activities by SBA representative, date, and time status or progress of vetting an EIDL.  The "Note" for the GUS EIDL contained chronological entries for contacts between the SBA and a person claiming to be MUSAYELYAN that indicated that the SBA, as part of EIDL underwriting, emailed MUSAYELYAN at the email account identified on the EIDL application a request that he provide his 2018 and 2019 tax returns and that, days later, the SBA received 2018 and 2019 tax returns in the name of MUSAYELYAN.

86.    The SBA's file included what appeared to be unsigned, "self-prepared" 2018 and 2019 calendar year federal income tax returns for MUSAYELYAN, bearing MUSAYELYAN's true Social Security number and residence address.  Each return

69

stated that MUSAYELYAN was engaged in "IT Consulting" under the fictitious business name of GUS (as opposed to under a corporate name), with his principal place of business as his true residence, and that his gross receipts were $1,284,942 for 2019. The return reported $70,841 in tax due and owing.

87.    IRS transcripts show that MUSAYELYAN's 2018 and 2019 tax returns that SBA received were filed in late 2021 and that no income taxes were actually paid.  Based on my training and experience, and review of evidence gathered in this investigation including that the MUSAYELYAN tax returns appear to have been prepared in two days and solely because the SBA required them for an EIDL modification, I believe that these returns were false.

88.    The GUS EIDL application identified a Wells Fargo bank account ending in 2739 (the "WF 2739") to receive the EIDL modification proceeds.  I reviewed records for the WF 2739 and learned, among other things, that out of those proceeds $400,000 was transferred in days to a Wells Fargo account ending in 2532 in the name of "Taron Musayelyan DBA Global Ultimate Management."  I reviewed the signature card for that account and learned that MUSAYELYAN had opened that account with his genuine Social Security number and date of birth, in a manner consistent with that of the other SUBJECTS who opened shell accounts at MCGRAYAN's direction and solely to facilitate fraudulent loans whose proceeds were laundered and not used as represented.

**O.    SUBJECT VACHYAN: False Claim, Wire fraud, Bank Fraud (PPPL only),and Money Laundering re "Art Mart" PPP and EIDL**

89.    I have probable cause to believe that VACHYAN schemed to defraud the SBA and a lender by making fraudulent statements and submitting fraudulent documents to obtain a PPPL and EIDL for a fake art dealer/shell called "Art Mart, Inc." ("Art Mart").  The proceeds of these fraudulently obtained loans were deposited into an account controlled by VACHYAN and disbursed in a manner consistent with that of the other shell accounts, thus supporting probable cause to believe that VACHYAN fraudulently participating in seeking the loans to launder their proceeds instead of for legitimate business purposes.

90.    The address for Art Mart that was provided on PPPL and EIDL applications, discussed below, and on bank statements, was 352 W Chevy Chase Dr Apt C, Glendale, CA 91204.  I searched online for a description of that property, and conducted a site visit there, and observed that the property is a small, multi-unit apartment building in a residential area.  I saw nothing in the nature of a "retail store [] that [according to the Internet description at www.mapquest.com/us/california/art-mart-inc-427506994, as of April 25, 2025] specializes in offering a wide selection of art supplies and materials[.]"

91.    SBA files and records that I reviewed from US Bank show that, on June 5, 2020, an application was submitted for a $494,677 PPPL in the name of "Art Mart, Inc. ("Art Mart").  Twelve days later, an application was submitted for an EIDL in the same name.

71

92.    The applications identified the same owner, VACHYAN, and had the same address and the same contact information.  The PPPL application and promissory note that were submitted to lender US Bank were e-signed by "Johan Vachyan" on June 9, 2020.

93.    The PPPL application claimed that Art Mart was an "art dealer" with "payroll" of 35 employees.  The EIDL claimed that Art Mart had 35 employees and 2019 gross revenue of $3.9 million.

94.    The EIDL application designated a US Bank account ending in 0638 (the "USB 0638") to receive a wire transfer of EIDL proceeds.  I received and reviewed records of US Bank obtained by subpoena and saw a signature card/account application dated September 24, 2017, that identified VACHYAN as the sole signatory and showed a signature that matches that of his driver's license.  I also compared that signature card and, in particular, VACHYAN's signature on it, to two other US Bank signature cards for US Bank accounts (the "USB 2692" and the "USB 3955") whose records were provided by US Bank along with those of the 0638 Account.  The USB 2692 signature card was for a personal account for VACHYAN and his wife (whose identity and marriage to VACHYAN I have verified from law enforcement databases), opened in 2016, and identified VACHYAN by his true date of birth and Social Security number and stated that he was employed by "G&H Medical Transportation."  The signature card for the USB 3955 identified VACHYAN as the "sole proprietor" of "Mart Art and Antiques" and identified VACHYAN by his true

Social Security number.  The signatures on all three signature cards appear to be written by one and the same person: VACHYAN.

95.    I obtained EDD records and learned that Art Mart had a single employee for a single quarter within the time period stated in the EIDL and PPPL applications.  I also obtained a response from the IRS to a Fact of Filing request and learned that Art Mart had never filed IRS Forms 941 or 940 to report wages and taxes withheld for employees.

96.    The PPPL application was approved and its proceeds, $494,677, were deposited into the USB 0638 Account on June 9, 2020.  I reviewed the USB 0638 records to trace the use of PPP proceeds and learned the following:

    a.    There were numerous checks bearing a signature that matched that of VACHYAN's driver's license and the signature card for the account.  None of the checks was consistent with that of paying for payroll of 35 employees as represented on the Art Mart EIDL, as described above.

    b.    Instead, the numerous checks were in the thousands, with no evidence of deduction for withholding or payment of payroll taxes, including checks dated June 10 and 11, 2020, for $17,100 and $16,900, respectively, to H.G.; June 12 and 13, 2020 for $17,800 and $21,000, respectively, to I.T. (whom I have determined to be a neighbor of SHAW and to whom SHAW wrote checks to be laundered from fraudulent loan

proceeds[14]); June 10, 2020, for $29,310 to "Swift Vending LLC," a purported entity that I believe was a shell; June 13 and 14, 2020, for $9,768 and $9,600, respectively, to A.M. and A.K., amounts that, as described above, are consistent with structuring; and June 24, 2020, for $19,600 to SHAW, about whom I have found no evidence that he was either an artist whose works were marketed by Art Mart or that he was employed by Art Mart.

97.    I reviewed federal income tax returns obtained from L.F. by subpoena.  L.F. was a tax preparer who provided copies of the returns that he prepared for numerous shells identified in this affidavit, including Art Mart.  I specifically reviewed the Art Mart federal income tax return for calendar year 2019 that L.F. provided and observed that the return reported gross income of $85,226 for 2019.  The return also reported nothing for the cost of labor (i.e., payroll).

98.    In August 2021, a PPP forgiveness application was submitted under the electronic signature of VACHYAN.  The forgiveness application stated that Art Mart paid 35 employees from the time of the deposit of the PPPL proceeds to October 31, 2020, and that Art Mart had 38 employees as of August 2021 for $856,451 "payroll and non-payroll costs."  As stated above, there does not appear to be any legitimate evidence (e.g., EDD

---

[14]  SHAW's related offense conduct is described in the concurrently submitted complaint and affidavit against SHAW and others for fraud in connection with pandemic stimulus applications.

or IRS records) for payroll expenses that were claimed in the forgiveness application.[15]

### P. SUBJECT NIKOGOSYAN: False Claim, Wire Fraud, and Money Laundering re "CM" EIDL

99.    I have probable cause to believe that NIKOGOSYAN knowingly participated in obtaining and then laundering the proceeds of more than $2 million in EIDL funding by, among other things, submitting phony tax returns prepared solely to obtain funds for a shell called "CM General Auto Electric Supplies, Inc." ("CM").

100.    On March 30, 2020, days after the Covid-19 lockdown commenced, an EIDL application was submitted online on behalf of CM.  NIKOGOSYAN was identified as CM's sole owner, including by his then true (per law enforcement databases) residence address, correct Social Security number, and date of birth.  The application stated that CM was opened in 2012, had "1" employee, and that its 2019 gross revenue was $929,000.

101.    In connection with evaluating CM's EIDL, SBA sought and received an email in May 2020 from an individual who identified himself as NIKOGOSYAN and provided what I believe, from law enforcement databases, was a copy of his Permanent Resident ("Green") card.  Law enforcement databases that I have

_____

[15]  Because I have probable cause to believe that MCGRAYAN and VACHYAN defrauded USB and the SBA by way of fraudulent statements, I have not discussed the use of proceeds.  I reviewed the bank statements showing the use and tracing of those proceeds and have probable cause to believe, as I have discussed several times herein, that those accounts show misuse and laundering of those proceeds.

checked have no record that NIKOGOSYAN reported that his Green card was lost, stolen, or misused.

102.    In early 2022, NIKOGOSYAN requested an EIDL modification on behalf of CM, to increase its EIDL by more than $1.5 million.  The "Note" section on the EIDL modification application indicated that the process lasted several months, in part based on the time taken to respond to the SBA's request for documents to support the modification request.

103.    Among other requests as reflected in the EIDL application "note" section, the SBA requested and received copies of NIKOGOSYAN's driver's license and Social Security card, both of which I believe, based on my review of law enforcement databases, were genuine.

104.    The SBA further requested that CM submit tax returns including for the calendar year 2021.  I reviewed a copy of that return that was submitted on behalf of CM and noted the following:

        a.    The return was prepared by A.M.

        b.    A.M. dated the return "03-09-2023."  I know from interviewing A.M. that he said that his custom and practice was that he dated returns the same date that he completed them and the client signed them.  Thus, this return was untimely.

        c.    Moreover, as A.M. had said that his MCGRAYAN Clients included NIKOGOSYAN, this return, like all others, was prepared at MCGRAYAN's and NIKOGOSYAN's request solely to support a loan application.

105.    A.M. had also provided documents in connection with his interview.  Those documents included photocopies of NIKOGOSYAN's driver's license and Social Security card because, as A.M. stated, he needed to verify the identity of his clients if they intended to sign their returns via DocuSign.  The 2021 CM return in the SBA file, described above, bears NIKOGOSYAN's DocuSigned signature.  Those documents also included 2018 and 2019 CM tax returns that each bore NIKOGOSYAN's live ink signature.  Copies of those returns were also provided to the SBA in connection with vetting a CM EIDL modification.  A.M. confirmed that NIKOGOSYAN signed those returns in A.M.'s presence along with standard IRS Forms 8879 that directed A.M. to e-file those return.  The 2018 and 2019 returns were similarly untimely and, I believe, prepared solely to fraudulently facilitate an EIDL modification.  Each of those returns, along with the 2021 returns, reported millions in revenue and tens of thousands in taxes due and owing.  According to the IRS transcripts for those returns, found in the SBA file, no taxes were paid.

Q.    **SUBJECT BORIS: False Claim, Wire Fraud, Bank Fraud, and Money Laundering re "CP Mobile Mechanics" PPPL**

106.    I have probable cause to believe that BORIS fraudulently schemed to obtain a $2 million PPPL and then laundered those funds to conceal the fraud.

107.    I reviewed SBA records and learned the following:

a.    On March 30, 2020 an EIDL was applied for in the name of "CP Mobile Mechanics Inc." ("CPMM").  The application

identified BORIS by his true date of birth and Social Security number and as CPMM's "CEO" and "100%" owner.

b.    The EIDL application stated that CPMM's gross revenue for 2019 was $1,275,000.

c.    The EIDL application identified a Bank of America account ending in 3396 (the "BofA 3396") for deposit of the EIDL proceeds.

d.    The EIDL "note" section shows an entry on May 19, 2020, that an individual on behalf of CPMM spoke to an SBA representative.  The individual verified that the EIDL application was valid.  The SBA representative advised that the individual needed to provide a copy of his "US Permanent Resident" card.  I reviewed a U.S. "Permanent Resident" card in the SBA records for this EIDL and I believe it to be genuine and for BORIS.

e.    That same day, an individual who identified himself as BORIS electronically signed a standard EIDL LA&A on behalf of CPMM and certified that CPMM would "use all the proceeds of this [EIDL] solely as working capital to alleviate economic injury caused by the [Covid-19 pandemic] occurring in the month of January 31, 2020[.]"

f.    On May 20, 2020, the day after SBA confirmed BORIS's identity via his Permanent Resident card, SBA wired $143,900 to the BofA 3396.

g.    I reviewed Bank of America records for the BofA 3396 and learned the following:

      i.   The proceeds of the CPMM EIDL described above were deposited into the BofA 3396 on May 20, 2020.

      ii.   Within about 60 days, substantially all of the EIDL proceeds were withdrawn via checks payable to several of the same shells described in this affidavit. I noted no payments to automobile parts suppliers, for equipment, utilities, or to individuals that appeared to be associated with real mechanic work.

108. Sometime after CPMM obtained the initial EIDL funding, CPMM sought two EIDL modifications that increased the total amount of CPMM's EIDL to just under $2 million:

      a.   On August 4,2021, an LA&A was e-signed by "Boris Sahakyan" to increase the initial EIDL to $500,000. A net check in the amount of $356,000 was wired to the BofA 3396 on August 16, 2021.

      b.   On October 27,2021, an LA&A was e-signed by "Boris Sahakyan" to increase the EIDL to $1,970,000. A net check in the amount of $1,470,800 was wired to the BofA 3396 Account on November 3, 2021.

      c.   As a condition to receiving the EIDL modification funds, CPMM was required, among other things, to authorize SBA to verify that CPMM had, in fact, filed federal income tax returns. IRS transcripts that the SBA obtained showed that CPMM untimely filed its 2019 calendar year federal income tax return (on March 4, 2021). Based on my training and experience, and the evidence gathered in this case, I have probable cause to believe that the untimely filed return was filed solely to

fraudulent obtain EIDL funding and not to comply with income tax laws.

109.    I obtained from JPMorgan Chase Bank, and reviewed, records for a "second draw" PPP obtained by CPMM, and records for an account ending in 8509 in the name of "CP Mobile Mechanic, Inc." (the "JPMC 8509"), and learned the following:

a.    On March 24, 2021, an application was submitted to JPMC for a "second draw" PPP on behalf of CPMM.  I know that a "second" or later draw PPP was similar to an EIDL modification as later draws are provided to the same entity upon newly established need.  A "first draw" PPP had been authorized in summer 2020 by Celtic Bank for a $23,437.50 PPP based on an application e-signed by "Boris Sahakyan" as "president" of CPMM.

b.    The "second draw" application was also e-signed by "Boris Sahakyan" and sought $1,087,525 for "payroll costs" for "35" employees.  The application stated that CPMM had $435,010 in monthly payroll costs as of February 4, 2021.

c.    JPMC required that second draw PPP applicants submit copies of their filed federal income tax returns.  CPMM's 2019 calendar year federal income tax return submitted to JPMC reported 2019 calendar year gross revenue as $7,252,000 or about five times the gross revenue that CPMM had reported to the IRS on which the second EIDL modification was based, as described above.  To be clear, I believe there is probable cause to believe both returns were fraudulent because the returns were obtained solely to fraudulently facilitate loans.

d.    The JPMC 8509 into which the PPPL second draw funds were deposited was opened on May 6, 2019, or about five days after BORIS assumed the CPMM corporate shell and at a time consistent with when other shell accounts were opened as described herein.

e.    The signature card/account application identified BORIS by his true driver's license and Social Security numbers and bore what I believe was a live ink date and signature that was consistent with that of BORIS's signature on his driver's license.

f.    Proceeds for the second draw PPP were deposited into the JPMC 8509 on March 26, 2021.  The prior balance was $151,605, so I have traced the use of the proceeds on a "first-in, first-out" basis that assumed that the prior balance was from legitimate sources.  There were three deposits that, based on the totality of the evidence described in this affidavit, I believe were deposited with the intent to be laundered.  Namely, there were three checks from shell "American Best Filter, Inc" from an account whose signatory was SUBJECT DIAMONDZ (for $9,000, $8,956, and $7,850) just days apart and clearly evidence of intent to structure as well as to money launder, as shown by these excerpts from those account records:






g.   Nonetheless, even by crediting those funds as legitimate, substantially all of the PPPL second draw proceeds were spent in approximately 60 days by withdrawals in the form of checks or online transfers to the same bogus shell entities as well as to SUBJECT MUSAYELYAN in the form of two $50,000 wire transfers to SUBJECT MUSAYELYAN in Armenia notated as "software technology expenses," as shown by this excerpt from those account records:

| 04/30 | 04/30 Online International Wire Transfer Via: Citibank N.A./0008 A/C: Ameriabank 0015 Yerevan, Armenia Ben: Taron Musayelyan Yerevan Am Ref: Custom Order Processing Software Technology Expenses Ssn: 0443382 Trn: 3405541120Es | 50,000.00 |

110.   Finally, EDD records showed only "no record" for any payroll paid by or for employees of either CPMM or BORIS for the time period covered by the PPPL draws.

**R.   SUBJECT DIAMONDZ: False Claim, Wire Fraud, and Money Laundering re "American Best Filter" EIDL**

111.   In addition to DIAMONDZ's offense conduct relating to the OAS PLP, described above, I have probable cause to believe that DIAMONDZ schemed to commit wire fraud using the same common plan for the other fraudulent activity described herein, namely, by opening multiple bank accounts knowing that

such accounts would be used to obtain loans and that such accounts would be manipulated by others, by participating in submitting fraudulent statements and documents to obtain an EIDL, and then by laundering fraud proceeds through her multiple accounts.

112.   I reviewed SBA records and learned the following:

a.   On June 16, 2020, an EIDL application was submitted online on behalf of "American Best Filter, Inc." ("ABF"), approximately three years before ABF (and DIAMONDZ) were associated with the fraudulent PLP transaction described above.  The application identified ABF's "business phone" as matching that on a JPMC account signature card for the first of multiple bank accounts that DIAMONDZ had just opened (as more fully described below).  The EIDL application also provided the same business address for ABF on each of the signature cards for those bank accounts (and that matched that of DIAMONDZ's residence address on her driver's license).

b.   The application stated that DIAMONDZ took over ownership of ABF on "1/1/2019," that there was "1" employee for this "retail" business, and that ABF's 2019 gross revenue was "$1,321,365."  Based on the totality of the evidence that I have reviewed in this case, including ABF's bank records, discussed below, and the file regarding the ABF PLP, discussed above, I believe that the gross revenue figure provided on the EIDL application was fraudulent and that ABF was simply a shell designed to defraud and launder money.

c.    The LA&A and EIDL promissory note were e-signed
by "Mery Diamondz" on June 24, 2020.  The LA&A, like all others
during this time period, required that "[b]orrower will use all
the proceeds of this Loan solely as working capital to alleviate
economic injury caused by disaster occurring in the month of
January 31, 2020[.]"

d.    SBA approved the ABF EIDL and funded it in the
amount of $149,900 on June 24, 2020.  The proceeds were wire-
transferred to a JPMC account ending in 0831 (the "JPMC 0831").
I reviewed the records for that account and learned that:

i.    from the time of its opening (March 2020) to
the date of the EIDL proceeds' deposit, the account was used,
like all other shells, to move money between shells based on the
timing, means of deposit, and other substantial similarities in
the accounts' transactions;

ii.    substantially all of the ABF EIDL proceeds
were transferred out for laundering through other shell
accounts, and

iii.    none of the EIDL proceeds was used as
represented or intended, i.e., for "working capital" for ABF.

113.    I reviewed bank records that show that DIAMONDZ
began her participation in the above-described fraudulent scheme
in substantially the same manner as other shell "owners," by
opening multiple bank accounts at about the same time in the
name of her shell, ABF:

a.    On March 23, 2020, less than two weeks after the
Covid-19 lockdown commenced, DIAMONDZ opened JPMC account ending

in 0831 in the name of ABF ("JPMC 0831"). The signature card
stated ABF's EIN as 84-3484169, which I know from reviewing an
EIN origination schedule provided to me by a co-case agent, was
obtained between May 13, 2019, and March 20, 2020, listed
DIAMONDZ's then residence (per her driver's license) as ABF's
business address, identified DIAMONDZ as ABF's "president," and
contained her true Social Security number and a signature that I
believe matches that of her genuine driver's license.

      b. The next day, DIAMONDZ opened Bank of the West
account ending in 2534 at a branch in Encino, also in the name
of ABF, at the same address she had provided the day before to
JPMC at a bank branch also located in Encino, by providing her
true date of birth, and Social Security and driver's license
numbers, and with a signature that I believe matches that of
both her driver's license and the JPMC signature card, above.

      c. On May 5, 2020, DIAMONDZ opened Wells Fargo
account ending in 7536 in the name of ABF (the "WF 7536"), using
the same address, identifying herself as the "owner with control
of the entity," claiming $100k as ABF's "annual gross sales"
from "administrative, support, waste management and remediation
services" and "water filtering and clean up," by providing her
true date of birth, Social Security number, and driver's license
number; and with a signature that I believe matches that of the
other signature cards, above, and her driver's license.

      d. On May 12, 2020, DIAMONDZ signed a signature card
for a personal Bank of America account ending in 1383 in her
alias name, DIAMONDZ, and also stating her given name, Mery

Babayan, by providing her true Social Security number.  The
signature card appeared to be an update as the records for the
same account contained multiple signature cards dating back to
the opening of the account in 2015.  One such update was dated
February 23, 2017, contained her signature that I believe
matches that of all other signature cards, discussed above, and
stated that her identity was confirmed by "US DRIVER LICENSE
W/PHOTO."

   e.    On July 24, 2020, DIAMONDZ opened BBVA (later
owned by PNC) bank account ending in 4277 in the name of ABF.
The signature card contains the same EIN but no personal
identifying information for DIAMONDZ.  It does contain a
signature which I believe matches that of all other signature
cards and her driver's license, discussed above.

   f.    Each of these accounts was used to moved shell
account funds like the other shell accounts described herein.
For example, the initial deposits into the WF 7536 consisted of
two "Edeposit(s)" in amounts that I believe were consistent with
that from shell accounts, as shown by this excerpt of the May
2020 WF 7536 statement:

**Your Business and Wells Fargo**

Visit wellsfargoworks.com to explore videos, articles, infographics, interactive tools, and other resources on the topics of business growth, credit, cash flow management, business planning, technology, marketing, and more.

**Account options**

A check mark in the box indicates you have these convenient services with your account(s). Go to wellsfargo.com/biz or call the number above if you have questions or if you would like to add new services.

| | |
|---|---|
| Business Online Banking | ✓ |
| Online Statements | ✓ |
| Business Bill Pay | ✓ |
| Business Spending Report | ✓ |
| Overdraft Protection | |

**Statement period activity summary**

| | |
|---|---|
| Beginning balance on 5/5 | $0.00 |
| Deposits/Credits | 12,940.54 |
| Withdrawals/Debits | - 0.00 |
| **Ending balance on 5/31** | **$12,940.54** |
| Average ledger balance this period | $10,070.42 |

Account number:  6278427536
AMERICAN BEST FILTER, INC.
California account terms and conditions apply

For Direct Deposit use
Routing Number (RTN): 121042882

For Wire Transfers use
Routing Number (RTN): 121000248

**Overdraft Protection**

This account is not currently covered by Overdraft Protection. If you would like more information regarding Overdraft Protection and eligibility requirements please call the number listed on your statement or visit your Wells Fargo branch.

---

REDE Page 2 of 190

May 31, 2020 • Page 2 of 4



**Transaction history**

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|---|---|---|---|---|---|
| 5/5 | | Deposit Made In A Branch/Store | 25.00 | | 25.00 |
| 5/11 | | Edeposit IN Branch/Store 05/09/20 10:20:53 Am 245 N Larchmont Blvd Los Angeles CA | 8,710.88 | | 8,710.88 |
| 5/11 | | Edeposit IN Branch/Store 05/11/20 01:12:54 Pm 245 N Larchmont Blvd Los Angeles CA | 4,204.66 | | 12,940.54 |
| **Ending balance on 5/31** | | | | | **12,940.54** |
| **Totals** | | | **$12,940.54** | **$0.00** | |

114.   My belief is supported not only by the totality of evidence of similar activity in other shell accounts, some of which is described above, but by the use of the WF 7536 account the very next month to launder funds to those same shell entities, as shown the following excerpt of the June 2020 WF 7536 statement, and because the account went substantially dormant the next month (July 2020):

**Statement period activity summary**

| | | |
|---|---|---|
| Beginning balance on 6/1 | $12,940.54 | |
| Deposits/Credits | 9,761.65 | |
| Withdrawals/Debits | - 16,182.46 | |
| Ending balance on 6/30 | $6,519.73 | |
| | | |
| Average ledger balance this period | $9,688.44 | |

AMERICAN BEST FILTER, INC.

California account terms and conditions apply

For Direct Deposit use
Routing Number (RTN): 121042882

For Wire Transfers use
Routing Number (RTN): 121000248

Account number: 6278427536

**Overdraft Protection**

This account is not currently covered by Overdraft Protection. If you would like more information regarding Overdraft Protection and eligibility requirements please call the number listed on your statement or visit your Wells Fargo branch.

REDE Page 6 of 190

June 30, 2020 • Page 2 of 4

WELLS FARGO

**Transaction history**

| Date | Check Number | Description | Deposits/Credits | Withdrawals/Debits | Ending daily balance |
|---|---|---|---|---|---|
| 6/3 | | Edeposit IN Branch/Store 06/03/20 04:05:09 Pm 611 E Wilson Ave Glendale CA | 4,830.41 | | 17,770.95 |
| 6/16 | | Bill Pay Orbit Mechanic on-Line xx69708 on 06-16 | | 1,005.84 | |
| 6/16 | | Bill Pay Cm General Auto Electric Supplie on-Line x53518 on 06-16 | | 1,200.45 | |
| 6/16 | | Bill Pay Mobile Auto Repair Inc on-Line x48722 on 06-16 | | 1,205.50 | |
| 6/16 | | Bill Pay Zart Art Printing Inc on-Line xx54448 on 06-16 | | 1,249.50 | |
| 6/16 | | Bill Pay Global Ultimate Management on-Line x40505 on 06-16 | | 1,340.55 | |
| 6/16 | | Bill Pay Cp Mobile Mechanic Inc on-Line x47920 on 06-16 | | 1,350.10 | |
| 6/16 | | Bill Pay Maxx Exclusive LLC on-Line xx54002 on 06-16 | | 1,360.45 | |
| 6/16 | | Bill Pay Shoreline Stone LLC on-Line xxx54031 on 06-16 | | 1,375.90 | |
| 6/16 | | Bill Pay Optimal Business Solutions LLC on-Line xxx01247 on 06-16 | | 1,498.05 | |
| 6/16 | | Bill Pay Nobel Event Planners on-Line x30684 on 06-18 | | 1,500.60 | |
| 6/16 | | Bill Pay 911 Janitorial Services LLC on-Line x40451 on 06-16 | | 1,505.32 | |
| 6/16 | | Bill Pay Global S Solutions on-Line x13487 on 06-16 | | 1,590.30 | 1,588.49 |
| 6/29 | | Edeposit IN Branch/Store 06/29/20 11:50:05 Am 1830 E Washington Blvd Pasadena CA | 4,931.24 | | 6,519.73 |
| Ending balance on 6/30 | | | | | 6,519.73 |
| Totals | | | $9,761.65 | $16,182.46 | |

## V. ADDITIONAL PROBABLE CAUSE IN SUPPORT OF REQUEST FOR ISSUANCE OF SEARCH WARRANTS

### A. MCGRAYAN Resides and Does Business at the SUBJECT PREMISES

115.    Queries in law enforcement databases revealed that MCGRAYAN resides at the SUBJECT PREMISES, including that his driver's license identifies the SUBJECT PREMISES as MCGRAYAN's residence.  On April 29, 2025, I conducted surveillance of the SUBJECT PREMISES and saw a Lexus parked in the driveway of the SUBJECT PREMISES within approximately 15 feet of the front door of that residence.  IRS-CI SA Geff Clark told me that he conducted surveillance of the SUBJECT PREMISES on April 28, 2025, and saw the same Lexus at the same location and noted its California license, no. 9LEV135.  A query of that license number in law enforcement databases revealed that the vehicle is registered to MCGRAYAN at the SUBJECT PREMISES.

116.    I reviewed a March 12, 2025 Statement of Information that was submitted online to the California Secretary of State that identified MCGRAYAN as the CEO of Exceed Companies whose "principal" and "mailing" address was the SUBJECT PREMISES.

117.    I reviewed an SBA application for a disaster loan that was submitted on January 10, 2025, for benefits related to the Los Angeles county fires under the name of Exceed Companies LLC and e-signed by "William Mcgrayan." The e-signature was verified by the Docusign authentication platform as that of MCGRAYAN. I used an open-source IP address lookup and geolocator platform to determine the location of the IP address on the Docusigned SBA application. The location was identified as "Tujunga canyon" whose geo-coordinates approximate those of the SUBJECT PREMISES. The application listed the SUBJECT PREMISES as MCGRAYAN's mailing address. The application also listed two phone numbers, which I know from searching law enforcement databases are cellular (mobile) phone numbers: (818) 730-7570 and (818) 570-9030. Open sources show that the latter number was subscribed to by "Annie Mcgrayan" and was the office number for Exceed Companies, which I know from public records was the LLC owned by MCGRAYAN and that was involved in the fraudulent PLP transactions described above. Open sources show that the former number is for Annie Mcgrayan, aka Ani Ghazaryan, whom I know from law enforcement databases to be related to MCGRAYAN and who also resides at the SUBJECT PREMISES.

**B.    Training and Experience Regarding the Offense Conduct**

118.    Based on my training and experience, and information obtained from other law enforcement personnel who investigate 18 U.S.C. §§ 286/287 (conspiracy to defraud the government with respect to claims/make false claims), 1343 (wire fraud), 1344 (bank fraud), 1956(h) (money laundering conspiracy), 1956(a)(1) *et seq.* (money laundering), 1957 (engaging in monetary transactions in property derived from specified unlawful activity), and/or 31 U.S.C. §§ 5313, 5324 (structuring), I know the following:

a.    Individuals involved in committing such offenses must keep evidence of their crimes, such as accounts used in the scheme, simply to keep the scheme going.  Much of this evidence is now stored on digital devices such as computers and smartphones.

b.    Generally, perpetrators of fraud schemes maintain the evidence described above where it is close at hand and safe, such as in their residences, automobiles, and, especially with smartphones, on their person.  My training and experience is further informed by the statements of F.N., some of which are described above, including that F.N. went to the SUBJECT PREMISES to deliver blank shell account checks to MCGRAYAN.

c.    Members of a fraud conspiracies or schemes must communicate with one another out of necessity.  Commonly this is done by text, email, telephone, or specialty communication application, often an encrypted one such as WhatsApp, as specifically discussed above, and most often by smartphone.

Members of the scheme commonly carry their smartphones, which include the contact information for their co-schemers, on or near their persons, such as in their cars or residences.

## VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>[16]

116.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the electronic evidence, inter alia, described below, is often retrievable from digital devices.

117.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

118.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of

---

[16] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

119.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

120.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

121.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices

for data during a search of the premises for a number of reasons, including the following:

122.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

123.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

124.    This search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

125.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a

user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

126.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

127.    Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress MCGRAYAN's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of MCGRAYAN's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

128.    Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VII. <u>CONCLUSION</u>

119.    For all the reasons described above, there is probable cause to believe that VAHE MARGARYAN, AKA WILLIAM MCGRAYAN; SARKIS SARKISYAN, AKA SAMUEL SHAW; AKSEL MARKARYAN,

AKA AXEL MARK; ASHOT BEJANYAN, AKA ALEX BENJAMIN; JACK AYDINIAN,

AKA JACK AYDI; TARON MUSAYELYAN, AKA TEYRON MUSEYELYAN; HOVANNES

HOVANNISYAN, AKA JOHN HARVARD; MERY BABAYAN, AKA MERY DIAMONDZ;

ANAHIT SAHAKYAN; FELIX PARKER; RUDIK YENGIBARYAN, AKA SAMUEL

STAVROS, YOHAN VACHYAN, AKA JOHAN VACHYAN, AKA JOHN VACHYAN,

KHACHATUR NIKOGHOSYAN, AND BORIS SAHAKYAN committed violations

of 18 U.S.C. §§ 286/287 (conspiracy to defraud the government

with respect to claims/make false claims), 1343 (wire fraud),

1344 (bank fraud), 1956(h) (money laundering conspiracy),

1956(a)(1) *et seq.* (money laundering), 1957 (engaging in

monetary transactions in property derived from specified

unlawful activity), and/or 31 U.S.C. §§ 5313, 5324 (structuring)

and that evidence of such violations, as described above and in

Attachment B of this affidavit, will be found in a search of the

SUBJECT PERSON and SUBJECT PREMISES, as further described above

and in Attachments A-1 and A-2 of this affidavit.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1
by telephone on this _23rd_ day of
May, 2025.

_____
HONORABLE PATRICIA DONAHUE
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A (*SARKISYAN et al Affidavit)***

## Contents

I.    INTRODUCTION.........................................3

II.   PURPOSE OF AFFIDAVIT.................................4

III.  SUMMARY OF PROBABLE CAUSE...........................7

IV    PROBABLE CAUSE......................................7

      A.    The Paycheck Protection Program...............7

      B.    The Economic Injury Disaster Loan Program........9

      C.    PPPL Forgiveness.............................11

      D.    Restaurant Revitalization Fund Grants..........12

      E.    SUBJECT SHAW: Wire Fraud, Bank Fraud, and Money
            Laundering re "Prime" PPPL....................13

            1.    SHAW's Background.......................13

            2.    Offense Conduct re "Prime" PPPL...........15

            3.    Wire Fraud re Prime's PPPL Forgiveness
                  Application............................19

      F.    SUBJECT MIKHAELYAN: Wire Fraud, Bank Fraud, and
            Money Laundering re "Cornwall" PPPL............20

      G.    SUBJECT MIKHAELYAN: Wire Fraud and False Claim re
            Cornwall EIDL...............................24

      H.    SUBJECTS MIKHAELYAN and YEMENEJIAN: Wire Fraud,
            False Claim, and Money Laundering re "Nairi" RRF
            .............................................25

      I.    MIKHAELYAN: Wire Fraud and False Claim re "Rest"
            EIDL Modification............................28

      J.    SUBJECT YEMENEJIAN: Wire Fraud and False Claim re
            "Tiny Tots" EIDL.............................30

      K.    SUBJECT TERZYAN: Wire Fraud, False Claim, and
            Money Laundering re "Grub House" EIDL and EIDL
            Modification................................34

      L.    SUBJECT TERZYAN: Wire Fraud, False Claim, and
            Money Laundering re "Grub House" RRF...........37

      M.    SUBJECT MARIANNA: Wire Fraud, False Claim, and
            Money Laundering re "Rustwood" EIDL............42

    N.    SUBJECT MARIANNA: Wire Fraud and False Claim re
        Personal EIDL..................................45

V.   CONCLUSION........................................47

**<u>AFFIDAVIT</u>**

I, Eric Ley, being duly sworn, declare and state as
follows:

**I.  <u>INTRODUCTION</u>**

1.   I have been a federal agent for more than 12 years.
Since May 2021, I have been a Special Agent of the U.S. Small
Business Administration ("SBA"), Office of Inspector General
("SBA-OIG").  Before that, I was a Special Agent with the United
States Secret Service for eight years.

2.   Since graduating from the Criminal Investigator
Training Program conducted at the Federal Law Enforcement
Training Center, I have over ten years of experience
investigating various criminal offenses including bank fraud,
wire fraud, and money laundering.  As such, I have interviewed
hundreds of witnesses and targets, participated in the execution
of numerous search and arrest warrants relating to financial
crimes, and worked with federal prosecutors to prepare
investigations for prosecution.

3.   For the past four years, I have focused on
investigating crimes associated with SBA-related loan and
guarantee programs including pandemic stimulus funding,
sometimes referred to as Covid-19 fraud.  From reviewing dozens
of pandemic stimulus loan files and documents associated with
those files such as subpoenaed bank records and public records,
I have become familiar with the processing and vetting of
applications under the Paycheck Protection and Economic Injury

Disaster Loan programs, among other pandemic-related funding programs.

4.    Through my investigations, my training and experience, and discussions with other law enforcement personnel, I have become familiar with the tactics and methods employed by those who conduct wire fraud schemes using fraudulent loan statements and fabricated documents, money laundering, and identity theft, among other federal offenses.  These methods include, but are not limited to, the use of wireless communications technology, such as encrypted messaging platforms such as "WhatsApp;" the creation or purchase of corporate "shells," i.e., corporations that have been formed through the filing of articles of incorporation but conduct no business and are used solely to create the appearance of legitimacy; fabricating bank statements or other business documents to satisfy lender underwriting requirements to qualify for loans; and moving funds through multiple accounts to promote and conceal fraud.

## II. <u>PURPOSE OF AFFIDAVIT</u>

5.    This affidavit is made in support of a criminal complaint against, and request for issuance of arrest warrants for, the following individuals (also, where context requires, by "SUBJECT [NAME]," or collectively, the "SUBJECTS"), for violations of 18 U.S.C. §§ 286/287 (conspiracy to defraud the government with respect to claims/make false claims), 1343 (wire fraud), 1344 (bank fraud), 1956(h) (money laundering conspiracy), 1956(a)(1) *et seq.* (money laundering), 1957 (engaging in monetary transactions in property derived from

4

specified unlawful activity), and/or 31 U.S.C. §§ 5313, 5324
(structuring) (collectively, the "Subject Offenses") as more
fully described below:

    SARKIS SARKISYAN, AKA SAMUEL SHAW ("SHAW");

    MIKHAEL MIKHAELYAN ("MIKHAELYAN");

    ARSEN TERZYAN, AKA STEVEN TERZAKI ("TERZYAN");

    SARKIS YEMENEJIAN ("YEMENEJIAN"); and

    MARIANNA SARKISYAN ("MARIANNA").

    6.    The facts set forth in this affidavit are based on my
personal observations; my training and experience; witness
interviews that I have conducted; reports that I have read of
interviews conducted by other law enforcement agents; my review
of documents obtained from third parties, either by way of
subpoena or voluntary submission, such as bank or business
records; my review of publicly-filed documents such as corporate
filings; Internet searches for open source information;
financial analyses or financial records summaries prepared by a
SBA analyst who told me that she reviewed and prepared such
analyses and summaries from bank and other financial records
obtained in this investigation, and whom I believe to be
qualified to make such analyses and summaries from having worked
with her for several years and having reviewed her work product
in other matters; and my review of documents created or amassed
by the SBA in connection with providing funding for the various
loans and grants more fully described below.  Accordingly,
absent mention below of specific attribution from any of the

above-summarized evidence, I have, solely for clarity, generally omitted attribution for a specific fact.

7.    Whenever I refer herein to a bank, I mean a financial institution whose deposits were insured by the Federal Deposit Insurance Corporation.  Whenever I refer herein to bank records, I have done so by identifying each account by an abbreviation for the bank followed by the account's last four digits, e.g., "JPMC 1234."  Whenever I refer to the substance or content of such accounts, such reference is based on my review of the records of the account(s), including bank statements, signature card/account application documents, canceled checks, offset and credits, and other records provided by each bank pursuant to a grand jury subpoena.  Similarly, unless stated otherwise, whenever I refer to records of or relating to the SBA, I am referring to SBA records that I have reviewed as accessible to me in my capacity as a Special Agent of the SBA-OIG.

8.    My description of the offense conduct below is based on my review of the above-summarized evidence and is provided solely for the purpose of establishing probable cause to believe that one or more of the above-stated offenses were committed by the SUBJECTS.  Accordingly, I have not described all of the evidence that I have reviewed during the course of this investigation and my omission of evidence or mention of other subjects or targets of this investigation should be considered in that light.

9.    Unless stated otherwise, all conversations and statements described in this affidavit are related in substance

and/or in part only; all dates are "on or about" or approximations; all amounts are rounded or close approximations; and the words "on or about" and "approximately" are omitted for clarity.

### III. **SUMMARY OF PROBABLE CAUSE**

10.   I have probable cause to believe that the SUBJECTS committed the Subject Offenses by creating, purchasing, or using corporations for use in name only, i.e., as "shells"; opening and assisting others in opening one or more bank accounts in the names of those shells; submitting and assisting others to submit fraudulent applications to obtain millions of dollars in pandemic stimulus funding; creating and submitting fake documents in support of those fraudulent applications; and laundering and directing others to launder the proceeds of such funding through multiple bank accounts for, ultimately, personal use.

### IV.  **PROBABLE CAUSE**

**A.    The Paycheck Protection Program**

11.   The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or about March 2020 that was designed to provide emergency financial assistance to Americans suffering economic harm as a result of the COVID-19 pandemic.  One form of assistance provided by the CARES Act was the authorization of United States taxpayer funds in the form of loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP;" loans under that program are

sometimes referred to herein as a "PPPL" or "PPPLs"). PPPL
proceeds were required to be used by the applicant business to
pay certain expenses such as payroll costs, interest on
mortgages, rent, and utilities.

12.    In order to obtain a PPPL, a qualifying business was
required, among other things, to submit a PPPL application that
required the applicant business (through its authorized
representative) to acknowledge PPP program rules and make
certain affirmative certifications that the applicant business
would comply with all such rules to be eligible to obtain a
PPPL. Such certifications required, among other things, that
the applicant affirm that "[PPP] funds will be used to retain
workers and maintain payroll or make mortgage interest payments,
lease payments, and utility payments," and that the "loan
proceeds will be used only for business-related purposes as
specified in the [PPPL application]" and consistent with PPP
rules. The authorized representative of the applicant was also
required to certify that "the information provided in th[e] PPP
application and the information provided in all supporting
documents and forms is true and accurate in material respects,"
and that "I understand that if the funds are knowingly used for
unauthorized purposes, the federal government may hold me
legally liable, such as for charges of fraud."

13.    A PPPL applicant's representative was also required
to state, among other things, the applicant's average monthly
payroll expenses and number of its employees. These figures
were used to calculate the amount of money that the business was

eligible to receive under the PPP.  In addition, the applicant's representative was required to provide documentation showing its payroll expenses and such other documentation as the SBA or the lender requested.

14.    A PPPL application and supporting documents were submitted online through a portal and processed by a participating lender.  The applicant's representative confirmed his/her true identity through a variety of means including providing personal identifying information, uploading a copy of that person's driver's license and/or Social Security card, and/or executing loan documents via a document authentication platform such as DocuSign.  If a PPPL application was approved, the participating lender would fund the PPPL using its own funds and would wire-transfer those funds to a bank account designated by the applicant.  By wire-transferring the loan proceeds to that designated account, the lender, the SBA and, ultimately, law enforcement would have yet another way to ensure that the application was sought by the stated applicant through his/her duly acting representative and that the applicant received and used those funds in accordance with PPP rules.

15.    If PPP lending criteria were followed by the lender, the SBA, in turn, guaranteed the borrower's repayment in the event of that borrower's default.

**B.    The Economic Injury Disaster Loan Program**

16.    In addition to the PPP, the CARES Act authorized taxpayer funds under the Economic Injury Disaster Loan program (individually, an "EIDL," or collectively, "EIDLs").  The EIDL

program provided low-interest funding to small businesses, renters, and homeowners affected by the COVID-19 pandemic.

17.   In order to obtain an EIDL, a qualifying business was required to submit an application to the SBA, typically through an online portal, and provide information about its operations, such as the nature of the applicant's business, e.g., "agriculture," the number of employees, and gross revenues for the 12-month period preceding the Covid-19 pandemic.  Like PPPLs, EIDL applicants were required to certify that all information in the application as provided by the applicant or on behalf of the applicant by their authorized representative was true and correct.

18.   An EIDL "Loan Authorization and Agreement" ("LA&A") was executed by the applicant's authorized representative as a condition of receipt of EIDL proceeds that stated that.  The LA&A required that the applicant use the EIDL proceeds only for purposes stated in EIDL rules, such as for employee payroll expenses, employee sick leave, and business obligations and expenses such as business debts, rent, and mortgage payments. EIDL funds could not be used other than for those purposes, including that such funds could not be deposited or held for future business operations, used to capitalize a new business or for business start-up expenses, or used for purposes not associated with the operation of a going concern.

19.   The amount of an EIDL was determined, in part, by the applicant's representations in the EIDL application about the nature of the applicant's business and the applicant's

10

statements about employees, and revenue.  Any funds paid under an EIDL were issued directly by the SBA from CARES Act appropriations by Congress.

20.    If the EIDL applicant also obtained a PPPL, EIDL proceeds could not be used for the same purpose as the PPP loan proceeds.

21.    PPP and EIDL applicants were also obligated to provide true and correct information in response to requests by PPP lenders or the SBA as part of the PPPL and EIDL vetting process, such as requests to clarify business ownership and requests to provide genuine payroll tax documents such as IRS Forms 940, 941, or W3 "Transmittal of Wage and Tax Statements."

### C.    PPPL Forgiveness

22.    Under certain circumstances, PPPL borrowers were entitled to forgiveness of their PPP obligations.  As a condition of forgiveness, borrowers were required to complete a "PPP Loan Forgiveness Application" on which their authorized representative represented and certified that the borrower had complied with all PPP rules "including the rules related to  . . . eligible uses of PPP loan proceeds[]" and that "[t]he information provided in th[e forgiveness application was] true and correct in all material respects."  The forgiveness application warned that "knowingly making a false statement to obtain forgiveness was a federal crime, punishable by imprisonment and/or a fine."

23.    I know from my training and experience, and from evidence gathered in this case, that PPPL lenders and the SBA

11

relied on an applicant's truthfulness in statements made on applications and related documents, and on the genuineness of documents submitted by applicants in support of applications, to determine whether to approve PPPLs or EIDLs.

**D.  Restaurant Revitalization Fund Grants**

24.   In March 2021, the American Rescue Plan Act became law and established the Restaurant Revitalization Fund ("RRF") for which Congress appropriated $28.6 billion for the SBA to award emergency assistance to qualifying businesses that served food or drink, essentially restaurants.  Entitlement was substantially based on pandemic-caused revenue loss.  The RRF was a conditional grant program, meaning that RRF recipients were not required to repay the funds so long as those funds were used for specific expenses and by a certain deadline.

25.   RRF applicants submitted personal and business information, typically through an online SBA portal, in support of each RRF application.  Among other things, applicants were required to list all owners of 20% or more of the business.  The listing for each owner required the owner's Employer Identification Number ("EIN"), Social Security number, or "Individual Taxpayer Identification Number."

26.   The SBA prioritized RRF awards to small businesses at least 51% owned and controlled by women, veterans, and/or the socially and economically disadvantaged.

27.    RRF recipients were required to certify that they would use RRF proceeds for normal business operations such as for payroll costs, health care, business mortgages or rent. Recipients were then required to submit a "post-award report" in which they certified that their RRF proceeds were used in compliance with the program.

**E.    SUBJECT SHAW: Wire Fraud, Bank Fraud, and Money Laundering re "Prime" PPPL**

1.    SHAW's Background

28.    In 2011, SHAW, under his given name Sarkis Gareginovich Sarkisyan, was convicted in Santa Clara Superior Court, case no. B1151803, of unauthorized access to computers (Cal.Pen.C. sec. 502(c)(1)), theft of credit card information (Cal.Pen.C. sec. 484e), counterfeiting credit cards (Cal.Pen.C. sec. 484i), and conspiracy (Cal.Pen.C. sec. 182). In 2023, SHAW changed his name from Sarkis Gareginovich Sarkisyan to Samuel SHAW. Genuine images of SHAW'S prior and latest driver's license are below:

 

29.    SHAW is the brother-in-law of SUBJECTS MIKHAELYAN and TERZYAN.

30.   SHAW has fraudulently claimed that he is the victim of identity theft by lying about his income and employment to obtain credit, failing to pay such debt, and then years later claiming the debts were not his.  I reviewed documents provided by BMW Financial Services ("BMW"), and spoke with Homeland Security Investigations analyst Michael Reid, and learned the following:

a.   In 2014, SHAW financed the purchase of a new BMW, in connection with which he provided his true Social Security number and listed his true residence address (the same address that, as more fully discussed below, he provided in connection with several fraudulent loan applications).  He claimed an annual salary of $876,000 as an employee of "Nairi Restaurant" (a business for which, as more fully discussed below, SHAW's brother-in-law, MIKAELYAN, and another SUBJECT, YEMENEJIAN, fraudulently obtained an RRF and by which SHAW was never employed).  I know from other documents in this case, also more fully discussed below, that SHAW during that same time period (2012 to 2020) fraudulently claimed that he was an "IT Specialist."

b.   SHAW paid loan installments on the BMW loan for approximately five years from a bank account that he controlled.

c.   In 2018, SHAW submitted a report under penalty of perjury to the Federal Trade Commission that he was the victim of identity theft with respect to the BMW loan and other debts.

d.   SHAW then sent a letter to Equifax (a credit reporting agency) in which he claimed that he was the victim of

14

identity theft relating to credit accounts (e.g., Macy's and Bloomingdale's).  Attached to SHAW's letter to Equifax was what appeared to be a Long Beach Police Department ("LBPD") report that indicated that SHAW had reported his identity theft to LBPD.  The report indicated that SHAW provided to LBPD the same purportedly misused credit accounts, including BMW (an account on which SHAW had paid installments for several years before claiming that his identity was stolen).

     e.   HSI Analyst Reid told me that he provided LBPD a copy of the purported LBPD report that SHAW had sent to Equifax. An LBPD employee responded that the purported report that SHAW had sent to Equifax was fake as the LBPD number on the purported report did not match the genuine report number in LBPD's files and that the purported report appeared to have been altered.

### 2.   Offense Conduct re "Prime" PPPL

31.   Prime Funding, Inc. ("Prime") was incorporated in 2018 and, in January 2021, its business address was updated in California corporation records to 7011 Liberty Drive, Van Nuys, CA (the "Liberty Address"), an address that I know from SHAW's driver's license and other sources to be SHAW's personal residence at all times relevant to this affidavit.

32.   Three months later, in April 2021, an application was submitted online for a PPPL on behalf of Prime.  The application identified SHAW as Prime's authorized representative and contained SHAW's driver's license, Social Security number, and the Liberty Address.  The stated reason for the PPPL was to cover Prime's payroll costs for 57 employees at an average

15

monthly payroll of $314,583.  The applicant submitted what appeared to be genuine Internal Revenue Service ("IRS") Forms 941 (quarterly payroll tax returns) that identified the Liberty Address as Prime's business address.

33.    I reviewed a response from the IRS pursuant to a law enforcement "Fact of Filing" request that is commonly used in these investigations to determine if IRS-related documents were actually filed with the IRS.  I learned that none of the Forms 941 submitted on behalf of Prime in connection with the PPPL was actually filed with the IRS.

34.    I also know from my training and experience that the California Employment Development Department ("EDD") maintains records of wages paid to employees.  I reviewed EDD records for Prime and learned that Prime had never reported the payment of any wages.

35.    The applicant for the Prime PPPL also provided as part of the PPP underwriting process what purported to be payroll reports prepared by a third-party payroll processor called "Paylocity," an entity that I know to be similar to payroll processor ADP.  The reports listed 56 names of individuals who were purportedly employed by Prime with titles like "customer service," "sales," or "admin."  I received information from Paylocity that Paylocity never did any payroll work for Prime and that the reports were fake.  Below is an image of one such report, showing gross wages of $1,539,526, that was submitted by the applicant for the Prime PPP:

**Payroll Report** — PRIME FUNDING (103369) — Payroll Period: 04/16/2021 TO 08/31/2021 — Page 2 of 3

| Company ID | Company Name | Employee ID | Employee Name | Cost Center | Gross Wages this Period | Gross Annual Salary | Monthly Average Wages | Medicare tax withheld | Social security tax withheld | Federal Income tax withheld |
|---|---|---|---|---|---|---|---|---|---|---|
| 103369 | PRIME FUNDING | Redacted | Albert Cummins | 1 – Customer Service | $30,513.77 | $68,540.00 | $5,713.67 | $879.16 | $3,759.16 | $3,668.21 |
| 103369 | PRIME FUNDING | | Amaru Johnson | 1 – Customer Service | $31,603.90 | $71,452.30 | $5,954.36 | $904.31 | $3,918.88 | $3,824.07 |
| 103369 | PRIME FUNDING | | Aracely Bentley | 3 – Sales | $30,398.68 | $68,300.00 | $5,708.33 | $878.68 | $3,756.96 | $3,666.07 |
| 103369 | PRIME FUNDING | | Arjun Hardy | 1 – Customer Service | $30,945.06 | $47,334.04 | $3,946.17 | $607.41 | $2,597.19 | $2,534.51 |
| 103369 | PRIME FUNDING | | Barrett Crane | 2 – Admin | $39,354.14 | $89,426.76 | $7,452.23 | $1,147.07 | $4,904.71 | $4,786.00 |
| 103369 | PRIME FUNDING | | Camron Serrano | 1 – Customer Service | $24,680.77 | $55,800.00 | $4,650.00 | $751.74 | $3,060.42 | $2,986.37 |
| 103369 | PRIME FUNDING | | Chaya Guzman | 1 – Customer Service | $32,843.39 | $74,252.35 | $6,187.70 | $952.43 | $4,072.46 | $3,973.93 |
| 103369 | PRIME FUNDING | | Christopher Ortiz | 2 – Admin | $13,720.38 | $31,020.00 | $2,585.00 | $397.89 | $1,701.33 | $1,660.17 |
| 103369 | PRIME FUNDING | | Destiny Collier | 1 – Customer Service | $30,363.05 | $89,540.00 | $5,713.67 | $879.16 | $3,759.16 | $3,668.21 |
| 103369 | PRIME FUNDING | | Dillon Moody | 3 – Sales | $21,214.63 | $47,963.32 | $3,996.94 | $611.22 | $2,610.61 | $2,566.97 |
| 103369 | PRIME FUNDING | | Duncan Underwood | 1 – Customer Service | $21,007.85 | $47,496.00 | $3,958.00 | $609.23 | $2,604.97 | $2,541.88 |
| 103369 | PRIME FUNDING | | Emiliano Atkinson | 1 – Customer Service | $17,816.76 | $40,281.36 | $3,356.78 | $516.69 | $2,208.99 | $2,155.83 |
| 103369 | PRIME FUNDING | | Emmett Williams | 3 – Sales | $36,598.29 | $82,743.96 | $6,895.33 | $1,061.33 | $4,538.19 | $4,428.39 |
| 103369 | PRIME FUNDING | | Gavyn Gardner | 1 – Customer Service | $21,007.85 | $47,496.00 | $3,958.00 | $609.23 | $2,604.97 | $2,541.88 |
| 103369 | PRIME FUNDING | | Gerald Hoang | 3 – Sales | $23,996.08 | $54,232.00 | $4,521.00 | $691.89 | $2,975.31 | $2,903.53 |
| 103369 | PRIME FUNDING | | Ginny Pennington | 1 – Customer Service | $12,585.71 | $28,454.64 | $2,371.22 | $364.99 | $1,565.61 | $1,523.87 |
| 103369 | PRIME FUNDING | | Giselle Curry | 1 – Customer Service | $8,423.31 | $19,044.00 | $1,587.00 | $244.28 | $1,044.69 | $1,019.22 |
| 103369 | PRIME FUNDING | | Gordon Cameron | 1 – Customer Service | $20,910.06 | $47,334.04 | $3,946.17 | $607.41 | $2,597.19 | $2,534.51 |
| 103369 | PRIME FUNDING | | Grayson Ramsey | 2 – Admin | $38,215.58 | $86,400.00 | $7,200.00 | $1,108.23 | $4,738.73 | $4,624.06 |
| 103369 | PRIME FUNDING | | Hailee Saunders | 3 – Sales | $19,034.62 | $43,080.00 | $3,590.00 | $552.58 | $2,362.77 | $2,305.60 |
| 103369 | PRIME FUNDING | | Ireland Graves | 2 – Admin | $13,720.38 | $31,020.00 | $2,585.00 | $397.89 | $1,701.33 | $1,660.17 |
| 103369 | PRIME FUNDING | | Janelle Camacho | 1 – Customer Service | $22,540.44 | $50,961.00 | $4,246.75 | $653.67 | $2,795.01 | $2,727.39 |
| 103369 | PRIME FUNDING | | Jayden Mayer | 1 – Customer Service | $24,347.71 | $55,047.00 | $4,587.25 | $706.08 | $3,019.12 | $2,946.07 |
| 103369 | PRIME FUNDING | | Jeremiah Moses | 1 – Customer Service | $18,852.31 | $42,600.00 | $3,550.00 | $546.43 | $2,336.65 | $2,279.92 |
| 103369 | PRIME FUNDING | | Jordan Hendricks | 1 – Customer Service | $18,723.28 | $87,348.20 | $4,350.93 | $661.78 | $2,836.68 | $2,680.81 |
| 103369 | PRIME FUNDING | | Joy Arroyo | 3 – Sales | $28,831.75 | $65,229.96 | $5,435.83 | $836.75 | $3,577.61 | $3,491.06 |
| 103369 | PRIME FUNDING | | Karl Greer | 3 – Sales | $23,383.75 | $52,867.56 | $4,405.63 | $678.13 | $2,899.36 | $2,829.43 |
| 103369 | PRIME FUNDING | | Kaliyah Campbell | 3 – Sales | $37,153.83 | $84,600.00 | $7,050.00 | $1,077.66 | $4,607.08 | $4,499.62 |
| 103369 | PRIME FUNDING | | Kamari Branch | 1 – Customer Service | $20,965.06 | $47,334.04 | $3,946.17 | $607.41 | $2,597.19 | $2,534.55 |
| 103369 | PRIME FUNDING | | Kayley Nicholson | 1 – Customer Service | $29,124.81 | $65,870.00 | $5,480.17 | $844.70 | $3,610.72 | $3,523.51 |
| 103369 | PRIME FUNDING | | Keira Massey | 1 – Customer Service | $18,376.92 | $42,000.00 | $3,500.00 | $538.73 | $2,303.34 | $2,247.81 |
| 103369 | PRIME FUNDING | | Kelsie Shepherd | 1 – Customer Service | $20,945.06 | $47,334.04 | $3,946.17 | $607.41 | $2,597.19 | $2,534.51 |
| 103369 | PRIME FUNDING | | Keaton Willis | 1 – Customer Service | $27,343.05 | $62,271.24 | $5,189.27 | $798.75 | $3,415.34 | $3,332.71 |
| 103369 | PRIME FUNDING | | Lincoln James | 3 – Sales | $24,733.31 | $55,896.25 | $4,658.02 | $716.98 | $3,065.69 | $2,991.52 |

*paylocity* — Paylocity Corporation (888) 873-8205 — Run on 09/15/2022 at 12:47 PM

36. The applicant for the Prime PPPL designated a JPMorgan Chase Bank ("JPMC") account ending in 6026 (the "JPMC 6026") to receive the proceeds of Prime's PPPL. I know that PPPL, EIDL, and RRF applicants were required to designate a bank account to which funds would be wire-transferred to the applicant.

37. An individual identifying himself as SHAW electronically, via the DocuSign authentication platform, acknowledged and then electronically transmitted to the lender, JPMorgan Chase, a standard form PPPL certification that stated, among other things, that PPPL proceeds would solely be used by Prime to retain employees and for certain of its business expenses.

38. Prime's PPPL was approved and funded by JPMorgan Chase in April 2021, for $786,457, with a wire transfer in that amount. I reviewed bank records for JPMC 6026 that showed the wire-transfer deposit of the Prime PPPL proceeds, and learned the following:

a.    The balance in the JPMC 6026 was $173 before the PPP proceeds were deposited.

b.    SHAW was the sole signatory on the 6026 Account. The signature card/account application identified SHAW by his true name, Social Security number, and date of birth.  His signature matched that of his driver' license.

c.    Within six weeks of the deposit, substantially all of the Prime PPPL proceeds were withdrawn or transferred out of the account.

d.    SHAW made more than $50,000 in cash withdrawals from the JPMC 6026 following the PPPL proceeds deposit, including four such withdrawals just under $10,000.  Based on my training and experience, I believe that those transactions indicated that transactions were structured to ensure that the bank did not submit Currency Transaction Reports to the U.S. Treasury Department.[1]

e.    There were no payments to any payroll company for Prime, nor were there any checks or transfers to any of the

---

[1]    The following legal authority was provided by the AUSA:

Federal law requires banks and other financial institutions to file reports with the Secretary of the Treasury whenever they are involved in a cash transaction or exchange of currency that exceeds $10,000.  "A person who willfully violates this law is subject to criminal penalties."  31 U.S.C. §§ 5313, 5324; 31 CFR § 103.22(a),(b)(2006 Ed.); *Ratzlaf v. United States*, 510 U.S. 135, 136 (1994); *see also, United States v. Turner*, 400 F.3d 491, 497 (7th Cir. 2005)(in case charging conspiracy to launder money, "we know that certain types of transactions may be indicative of a design to conceal.  These include transactions surrounded in unusual secrecy, structured transactions, depositing ill-gotten funds into another's bank accounts, using third parties to conceal the real owner, or engaging in unusual financial moves which culminate in a transaction.").

names of purported Prime employees listed on the "Paylocity"
reports.

        f.   Out of PPPL proceeds, SHAW wrote a $49,569 check
(the signature on the check matches that of SHAW's driver's
license) to "Humboldt Wholesale, Inc.," which, on further
investigation, appeared to be a supplier of items to cultivate
marijuana.  See, e.g., https://www.dnb.com/business-
directory/company-
profiles.humboldt_wholesale_inc.cd260285658c4f8a89458e6c479d928e
.html.

        g.   Out of the Prime PPPL proceeds in the JPMC 6026,
SHAW also made large online payments to individuals whom I
identified as friends or neighbors of SHAW's father and who were
not identified on either the fake Paylocity or EDD records as
associated with or employed by Prime:

           April 29, 2021 – June 8, 2021 - $90,000.00  to E.T.

           May 24, 2021 – June 9, 2021 - $17,468.00  to T.T.

           May 24, 2021 – June 9, 2021 - $17,532.00  to A.T.

       3.   Wire Fraud re Prime's PPPL Forgiveness
           Application

    39.   In June 2022, an application was submitted online to
forgive Prime's PPPL.  "Sarkis G. Sarkisyan" (whose name matches
that on SHAW's previous driver's license, depicted above) was
identified as the "primary contact" on the forgiveness
application and the Liberty Address was provided as Prime's
"business address."  The forgiveness application was
electronically signed by "Sarkis Sarkisyan" as Prime's

"authorized representative."  Based on this evidence and the evidence that shows that SHAW controlled and misused the Prime PPPL proceeds, described above, I have probable cause to believe that SHAW submitted this forgiveness application and will refer to that application as such.

40.  SHAW was required to certify that the Prime PPPL proceeds were "used to pay business costs that are eligible for forgiveness," such as payroll costs to retain employees.  SHAW stated that Prime's payroll costs were $1,539,526.58, an amount that matched that of the payroll costs on the phony Paylocity payroll report submitted to support the PPPL, as described above.

41.  Again, in reviewing bank records showing the wire transfer of the Prime PPPL proceeds to the JPMC 6026, I did not see any withdrawals or transfers that appeared to be for Prime's payroll.

**F.    SUBJECT MIKHAELYAN: Wire Fraud, Bank Fraud, and Money Laundering re "Cornwall" PPPL**

42.  On May 20, 2020, an application for a PPPL was submitted on behalf of the "Cornwall Group, Inc." ("Cornwall").

43.  Public records show that MIKAELYAN was Cornwall's sole officer and director, and at various times in public records its stated business was "management" or "water restoration."

44.  Contrary to the above-described public records, Cornwall's PPPL application stated that Cornwall was a

"miscellaneous store retailer," had 81 employees, and had an average monthly payroll of $357,541.

45.   The applicant also submitted various documents in support of the application, including, similar to SHAW's PPPL application for Prime, an IRS Form 941.  Here, that form reported that Cornwall had paid wages in the first quarter of 2020 in excess of $1 million.

46.   I submitted an IRS Fact of Filing request for Cornwall and from that response confirmed that no such form was actually submitted to the IRS.

47.   The applicant also submitted a payroll report purportedly from Paylocity, the same payroll company whose payroll report SHAW had fabricated.  The report listed purported Cornwall employees and their wages.  I learned from EDD that EDD has no record of the purported employees and from Paylocity that it had no records for Cornwall.

48.   An individual identifying himself as MIKHAELYAN electronically, via the DocuSign authentication platform, acknowledged and then electronically transmitted to the lender, Bank of America, a standard form PPPL certification that stated, among other things, that PPPL proceeds would solely be used by Cornwall to retain employees and for certain of its business expenses.

49.   Bank of America approved the Cornwall PPPL application and funded the loan of $893,852 in May 2020.  I reviewed records from Bank of America for a Bank of America

account ending in 7587 (the "BofA 7587") into which the Cornwall PPP proceeds were deposited.  I learned the following:

        a.    An individual identifying himself as MIKHAELYAN opened the BofA 7587 in 2017.  The signature card/account application identified MIKHAELYAN by his true date of birth and genuine Social Security and driver's license numbers.

        b.    MIKHAELYAN was the sole signatory on the BofA 7587.  The signature on the signature card matches that of MIKHAELYAN on his genuine driver's license.

        c.    The balance just before the deposit of the Cornwall PPP loan proceeds was *de minimus*.

        d.    Substantially all of the Cornwall PPPL proceeds were withdrawn in the form of checks within about a week of the proceeds' deposit, including a $40,000 check to the Los Angeles Rams.  The signatures on that check (and each check) matched that of MIKHAELYAN's driver's license:



    50.    In August 2021, an application was submitted for forgiveness of the entire Cornwall PPPL.  The application electronically certified, in a manner similar to the initial PPPL certification, that Cornwall had 82 employees at the time

of the forgiveness application and that the PPPL proceeds were used for Cornwall's business expenses including 60% for payroll.

51.    I also saw a check within the BofA 7587 records, that I believe bore MIKHAELYAN's genuine signature, for $479,000. The check bore the notation "PPP payroll" (the "PPP Payroll Check"):



52.    The balance in the BofA 7587 at the time of the PPP Payroll Check consisted substantially of unspent Cornwall PPPL loan proceeds.  I traced the deposit of the PPP Payroll Check to a different Cornwall account, at HSBC bank (the "HSBC Account"). I reviewed records of that account and learned that the HSBC Account was opened three months before the date that the Cornwall PPPL application was submitted.  The signature card/account application identified the sole signatory as MIKHAELYAN, by his true personal identifying information.  I also learned from reviewing bank statements for the HSBC Account that there were no checks or withdrawals to any person named as a Cornwall employee on the Paylocity report, nor were there any payments to Paylocity or other transfers consistent with paying wages or compensation to others at least for the operation of a

"miscellaneous store retailer" as MIKHAELYAN had represented on the Cornwall PPPL application.

**G.    SUBJECT MIKHAELYAN: Wire Fraud and False Claim re Cornwall EIDL**

53.    On July 14, 2020, an EIDL application was submitted to SBA for a $150,000 EIDL on behalf of Cornwall.  The standard form application identified MIKHAELYAN as the contact person, giving his correct address, and stating that Cornwall had 2019 calendar year revenue of $478,000 (nearly the same number as the PPP Payroll Check that MIKHAELYAN had signed a few weeks earlier); had two employees (compared to 82 as MIKHAELYAN had stated on the Cornwall PPP application only two months earlier); and had zero revenue for 2020 (compared to over $1 million as stated on the Form 941 for the first quarter of 2020 that MIKHAELYAN had submitted in support of the Cornwall PPPL application).

54.    A person who identified himself as MIKAELYAN signed the standard form Loan Authorization and Agreement ("LA&A") via the DocuSign online authentication platform in which he represented that Cornwall would, in pertinent part, "use all the proceeds of this [l]oan solely as working capital to alleviate economic injury caused by disaster occurring in the month of January 31, 2020[.]"

55.    On the basis of the applicant's representations, above, the EIDL was approved and its proceeds ($149,900, net of fees) wire-transferred to the HSBC Account.  MIKHAELYAN promptly signed checks to spend-down substantially all of those proceeds,

including checks to MIKHAELYAN's sister, SUBJECT MARIANNA SARKISYAN and to others not identified on the Paylocity report as "employees" of Cornwall.

**H.    SUBJECTS MIKHAELYAN and YEMENEJIAN: Wire Fraud, False Claim, and Money Laundering re "Nairi" RRF**

56.    In May 2021, an application for an RRF for a restaurant called "Nairi Meat & Deli" in Hollywood, CA ("Nairi and the "Nairi RRF") was submitted to the SBA.  The email contact on the application was "mikaelyanmike@gmail.com."

57.    RRFs were offered to support the restaurant industry by providing funding to offset significant pandemic-related revenue loss.  RRFs had specific requirements to ensure equitable distribution to small business concerns owned by women, veterans, and socially and economically disadvantaged applicants.

58.    The Nairi RRF application identified L.D., a woman, as the president and 100 percent owner.  I interviewed L.D.  She told me that she did not own Nairi at the time of the RRF application and that she gave up ownership to MIKHAELYAN and her ex-husband, YEMENEJIAN, in the early 2000's.  L.D. also stated that she could not recall whether she or MIKHAELYAN submitted the Nairi RRF application, but in any event that she gave MIKHAELYAN permission to do so.  MIKHAELYAN was previously identified as Nairi's sole owner on an EIDL application.

59.    In further support of the Nairi RRF, the applicant submitted a 2019 federal income tax return for Nairi that, according to IRS transcripts that I reviewed, was filed

approximately two weeks before the RRF application was submitted, thus indicating that the return was untimely (i.e., it should have been filed in 2020) and prepared to facilitate the Nairi RRF as opposed to reporting financial activity to comply with tax laws.

60.   The SBA approved the Nairi RRF and in May 2021 wire-transferred the RRF grant proceeds of $1,905,824 to a JPMC account ending in 5870 (the "JPMC 5870").  I reviewed records for the JPMC 5870 and learned the following:

a.   L.D. was removed as a signatory before the RRF was sought, and MIKHAELYAN was replaced as the sole signatory.

b.   Within about two weeks after the Nairi RRF proceeds were deposited into the JPMC 5870, YEMENEJIAN, who was not a signatory on the account, wrote 16 checks to MIKHAELYAN (and confirmed as such during an interview), each in the amount of $4,567.50, totaling $73,072.[2]  I know from my training and experience that individuals frequently transact in amounts below $10,000 for fear of drawing suspicion for structuring.  The detail of those checks is as follows:

| Date of Check | Amount | Payee |
| --- | --- | --- |
| March 15, 2020 | $9,135 | Mikael Mikaelyan |
| March 31, 2020 | $9,135 | Mikael Mikaelyan |
| April 3, 2020 | $4,567.50 | Mikael Mikaelyan |
| April 10, 2020 | $4,567.50 | Mikael Mikaelyan |
| April 17, 2020 | $4,567.50 | Mikael Mikaelyan |
| April 24, 2020 | $4,567.50 | Mikael Mikaelyan |

[2] The bank still honored the checks, even though signed by a non-signatory.

c.    L.D.'s ex-husband, SUBJECT YEMENEJIAN, wrote numerous checks on the account, again even though he was not a signatory, including to "Express Restoration."  I know from reviewing evidence in this case that "Express Restoration" was a purported corporation – likely just a shell – whose president was identified on public records as MIKHAELYAN.

d.    YEMENEJIAN also wrote a $36,504 check to "Humboldt Wholesale," the same entity that SHAW paid out of PPPL funds and that I believe from open sources to be a marijuana cultivation supply business.  I have found no information that Nairi was a marijuana dispensary in addition to being a restaurant.

e.    L.D. also told me that she was remodeling her residence during the time that the Nairi RRF proceeds were received and that a check signed by YEMENEJIAN out of those proceeds, to Bank of America for $104,044, was to pay off a secured loan that she had obtained for home improvements that had nothing to do with Nairi's operation.

f.    All told, YEMENEJIAN signed over 150 checks totaling more than $1.2 million out of the RRF proceeds to a variety of payees, some of which appeared to be shells or, at least, not restaurant suppliers or Nairi employees according to EDD records and the absence of related IRS records.

61.    The SBA required that all RRF recipients submit annually a "post award report" in which the RRF recipient's representative was required to certify that the RRF funds had been used as required, i.e., for restaurant-related expenses.

62.   I reviewed a post-award report for Nairi that was submitted via email from the same email account that identified on the Nairi RRF application: "mikhaelyanmike@gmail.com."  The report certified that all RRF proceeds were used for permissible business-related expenses.  The post-award report did not mention or separately itemize the $73,072 payments to MIKHAELYAN, the $104,044 payment to pay off L.D.'s loan from Bank of America, or the $36,504 payment to the marijuana cultivation supply business.

63.   In June 2024, during this investigation and shortly after I first spoke to L.D., MIKHAELYAN called me.  He told me that he owned Nairi and that he wanted to participate in an interview that I had scheduled with L.D.  I told MIKHAELYAN that he could not participate in the interview of L.D. but that I would separately interview him.  He stated that he should be present during L.D.'s interview because they "were family."  He then stated that he only "managed the operations" of Nairi and would not answer when I asked if he "owned" Nairi.  He repeated that he was "in charge" of operations and added that YEMENEJIAN was also involved in running Nairi.

**I.   MIKHAELYAN: Wire Fraud and False Claim re "Rest" EIDL Modification**

64.   In May 2020, an EIDL application for $150,000 was submitted online on behalf of Rest Assured Restoration ("Rest"). The EIDL application showed MIKHAELYAN's true name, date of birth, and email address that matched that of the RRF application and related RRF documents.  The applicant stated

28

that Rest was in the "personal services" industry, had 18 employees, and had gross revenues for calendar year 2019 of $754,000.

65.    Per records that I obtained from EDD, Rest had no employees and no filings at all.

66.    Per an IRS Fact of Filing request, the IRS had no records of payroll tax returns for Rest.

67.    The Rest EIDL was approved and its proceeds were deposited into an account whose sole signatory was MIKHAELYAN.

68.    In late 2021, the SBA received an application to modify the Rest EIDL by increasing the loan by $350,000.  The Rest EIDL file "notes" section (that I know contained summaries of communications between borrowers and SBA loan officers, including requests for additional financial information) reflected that MIKAELYAN was advised that he needed to provide genuine federal income tax returns for Rest for calendar years 2019 and 2020 to justify the modification and to authorize the SBA to confirm that such returns were filed with the IRS.

69.    I reviewed in the Rest EIDL file what appeared to be Rest calendar year 2019 and 2020 federal income tax returns signed by MIKHAELYAN and IRS transcripts that reflected the filing of such returns.  The transcripts showed that the returns had not been timely filed but, instead, were filed together in December 2021, just before the Rest EIDL modification request was made.  The transcripts reflected that Rest had gross income for each year of more than $1 million and that Rest owed tens of

thousands of dollars in income taxes.  No taxes were actually paid.[3]

70.    The SBA ultimately denied the Rest EIDL modification request by concluding that Rest had filed its income tax returns solely to qualify for the EIDL modification rather than to reflect genuine financial activity.

### J.    SUBJECT YEMENEJIAN: Wire Fraud and False Claim re "Tiny Tots" EIDL

71.    In August 2020, an application was submitted online for an EIDL for Tiny Tots Childcare, Inc. ("Tiny Tots") for $150,000.  The applicant described Tiny Tots as providing "educational services" and "daycare" since its "start date" of January 1, 2019.

72.    An individual identified as YEMENEJIAN electronically signed an EIDL LA&A for the Tiny Tots EIDL on August 7, 2020, in which the applicant promised to "use all the proceeds of this Loan solely as working capital to alleviate economic injury caused by disaster occurring in the month of January 31, 2020[.]"  Thus, by the terms of the LA&A, TTCI had to be in existence "in the month of January [], 2020."

73.    The Tiny Tots EIDL was funded and, based on my review of SBA records relating to this EIDL, its proceeds were wire-

---

[3]    As more fully described in the concurrently submitted request for issuance of arrest and search warrants for SUBJECT MCGRAYAN, *et al.,* I have probable cause to believe that SUBJECTS submitted fraudulent tax returns to obtain loans in a somewhat creative manner where the returns fraudulently reported substantial income and tax due in order to create the appearance of legitimacy.  No tax was ever paid.

transferred into California Credit Union Account ending in 8996 (the "CCU 8996").

74.   I reviewed records for the CCU 8996 and learned the following:

     a.   The signature card/account application identified YEMENEJIAN as Tiny Tot's authorized representative and provided his true name, date of birth, and driver's license number.  The account was opened with $200 on August 5, 2020, or one day before the Tiny Tots EIDL application was submitted to the SBA.

     b.   YEMENEJIAN was identified on the signature card/account application as the CEO and 100% owner of Tiny Tots. I recognized the signature on the signature card/account application as matching that of YEMENEJIAN's driver's license, a copy of which was also included in the CCU records.

     c.   CCU records also contained a "Statement of Information" ("SOI") for "Tiny Tots Childcare, Inc.," filed with the California Secretary of State on July 31, 2020, or five days before the CCU 8996 was opened.  The SOI, which I confirmed had, in fact, been publicly filed, identified YEMENEJIAN as the sole officer and director of Tiny Tots at the same address for Tiny Tots that YEMENEJIAN had given when he opened the CCU 8996.

     d.   CCU 8996 records show that the Tiny Tots EIDL proceeds of $149,900 (net of fees) were deposited into that account on August 10, 2020.  The prior balance was $200, an amount credited to the account when it was opened days earlier. There was no other deposit activity.

31

e.   As more fully described below, none of the EIDL proceeds was used "solely as working capital to alleviate economic injury caused by disaster occurring in the month of January 31, 2020" because, as described below, Tiny Tots never opened.

75.   An application for an EIDL modification for Tiny Tots was later sought to obtain another $349,900.  In connection with that application, as required and requested by SBA to underwrite the EIDL, the applicant provided a 2019 federal income tax return for Tiny Tots that indicated it had been prepared by C.H. I interviewed C.H., who told me the following:

a.   He is a tax preparer.

b.   He prepared the Tiny Tots return that I saw in the SBA's Tiny Tots EIDL modification file.

c.   YEMENEJIAN came to C.H.'s office and presented a small piece of paper with line items for purported business income and expenses for Tiny Tots.  YEMENEJIAN directed C.H. to prepare Tiny Tots's 2019 federal income tax return using that information.

d.   YEMENEJIAN did not provide any other information to C.H. for the preparation of the return.

e.   C.H.'s practice was to prepare returns for clients based on information provided by clients.  C.H. did not personally verify or audit any such information.  C.H. would simply instruct clients, including by providing cover letters for returns, that the returns that he prepared for clients based

on client's information were simply, in essence, as reliable and accurate as that information.

f.    YEMENEJIAN signed Tiny Tots's 2019 federal income tax return in C.H.'s presence.

76.    I reviewed that return and learned that, among other things, YEMENEJIAN reported that Tiny Tots had gross revenue from operations for calendar year 2019 of $356,640.  Based on my training and experience, and review of the totality of the evidence gathered in this investigation, I have probable cause to believe that YEMENEJIAN submitted made up numbers to C.H. with the intent that C.H. prepare a false income tax return to fraudulently facilitate obtaining this EIDL.

77.    I served a grand jury subpoena on YEMENEJIAN as Tiny Tots's custodian of records and agent for service of process. Through counsel, YEMENEJIAN produced a building lease in response to the subpoena's request for that and other records. I reviewed the lease and learned the following that the lease was executed on August 30, 2018.  The lessor was identified as S.B.

78.    I interviewed S.B. and learned the following:

a.    S.B. told me that he was the lessor for the subject property and that he met YEMENEJIAN to negotiate the lease on behalf of Tiny Tots.

b.    S.B. stated that the lease with Tiny Tots never took effect because the City of Los Angeles refused to issue Tiny Tots a permit to operate.

33

c.    S.B. gave me a copy of the lease from his (S.B.'s) files.  The lease was similar to the copy that YEMENEJIAN had produced pursuant to the grand jury subpoena. However, S.B. also produced an "amendment" to the lease that YEMENEJIAN had not produced.  The "amendment" was dated June 2019 and signed by S.B. and by YEMENEJIAN (his signature plainly matched that of known exemplars).  The "amendment" stated that it related to the lease "between [S.B.'s business] and Sarkis Yemenejian dated August 30, 2018," and that "lessee and lessor her[e]by agree to cancel such lease[.]"  The "amendment" also stated that YEMENEJIAN's previously paid security deposit of $30,472 was to be repaid, at YEMENEJIAN's direction, to L.D. (YEMENJIAN's ex-wife).

79.    I reviewed the CCU 8996 records and confirmed that YEMENEJIAN had written S.B.'s company a deposit check of $30,472 out of proceeds of the Tiny Tots EIDL.

80.    Based on my review of the TTCI EIDL records provided by SBA, I learned that YEMENEJIAN paid nothing toward repayment of the Tiny Tots EIDL and concealed from the SBA that Tiny Tots never operated.

**K.    SUBJECT TERZYAN: Wire Fraud, False Claim, and Money Laundering re "Grub House" EIDL and EIDL Modification**

81.    In January 2021, an application was submitted to SBA for a $150,000 EIDL on behalf of "Grub House, Inc." ("Grub House" or the "Grub House EIDL").  TERZYAN[4] was identified on the

---

[4]  In 2016, TERZYAN was convicted in this district of conspiracy to possess 15 or more unauthorized access devices, in

*(footnote cont'd on next page)*

Grub House EIDL application by his true name, Social Security number, and driver's license number.

82.    The application claimed that Grub House's revenue for the 12 months preceding January 31, 2020, was $433,441.

83.    In March 2021, an individual identified as "Arsen Terzyan owner/officer" e-signed the standard form EIDL "Loan Authorization and Agreement" ("LA&A") on behalf of Grub House. Like that of substantially all other EIDL LA&As, the signer promised that "[b]orrower will use all the proceeds of this Loan solely as working capital to alleviate economic injury caused by disaster occurring in the month of January 31, 2020 and continuing thereafter[.]"

84.    The Grub House EIDL application also identified a JPMC account ending in 3502 (the "JPMC 3502") as the bank account into which EIDL proceeds should be wire-transferred.

85.    On April 2, 2021, the Grub House EIDL proceeds of $149,900 (net of fees) were wire transferred from the SBA to the JPMC 3502. I reviewed records for the JPMC 3502 and learned the following:

         a.    The account was opened in October 2019.

         b.    The signature card/account application showed that an individual identified as TERZYAN opened the account by providing his true name and genuine Social Security and driver's license numbers. The signature on the signature card/account application matched that of TERZYAN's driver's license.

---

violation of 18 U.S.C. section 1029(b)(2) and sentenced to three years in prison. *United States v. Nazar Daniyelyan, et al.,* CR 15-621-GW.

c.   The balance in the account before the deposit of the Grub House EIDL proceeds was $1,361.

86.   Substantially all of the Grub House EIDL proceeds were spent in 30 days as the balance in the JPMC 3502 at the end of the statement period for the deposit (approximately April 2021) was $524.

87.   I traced the use of the Grub House EIDL proceeds.  I saw 17 checks totaling $102,070, each bearing a signature of TERZYAN that matched that of his driver's license, in amounts consistent with structuring.  None appeared consistent with use as working capital to alleviate damage caused by the Covid-19 pandemic, and at least one such payment was to TERZYAN's sister-in-law, SUBJECT MARIANNA:

| Date Range | Amount | Payee |
|---|---|---|
| April 2, 2021 | $8,500.00 | Terzyan Personal Account |
| April 2, 2021 | $9,892.00 | Terzyan Personal Account |
| April 1 – April 3, 2021 | $50,000 | No Limit Cargo |
| April 6 – April 9, 2021 | $17,700.00 | A███ G███ |
| April 7, 2021 | $9,150.00 | Home Energy Rating |
| April 7, 2021 | $9,150.00 | Hers Raters |
| April 14, 2021 | $14,000.00 | Marianna Sarkisyan |

88.   In April 2021, an application was made for a modification to the Grub House EIDL to increase the total EIDL to $500,000.

89.   I know from my training and experience that the SBA at that time commonly required that applicants submit tax returns and/or provide the SBA with permission (via an IRS Form

4506-T) to obtain directly from the IRS transcripts for the applicant as well as the applicant's tax returns.

90.    The Grub House EIDL file contained an IRS Form 4506-T bearing the electronic signature of TERZYAN.

91.    I reviewed the transcripts that the SBA obtained for federal income tax returns for the calendar years 2018 and 2019. The transcripts showed that Grub House's income tax returns for those years were untimely, submitted on the same day in February 2021, and prepared by the same tax preparer, L.F., whom I know from the evidence in this case was identified as the tax preparer for several other targets including SHAW and MIKHAELYAN.

92.    The chronological activity section on the EIDL application ("note" section) indicated that the SBA declined the EIDL modification because Grub House's tax returns were obtained to qualify for the EIDL modification as opposed to submitted to report genuine financial activity.

**L.    SUBJECT TERZYAN: Wire Fraud, False Claim, and Money Laundering re "Grub House" RRF**

93.    In May 2021, an application was submitted to the SBA for an RRF on behalf of Grub House, Inc. ("Grub House" and the "Grub House RRF").  The "100%" owner was identified as TERZYAN, and provided his residence address at 16719 Lahey St., Granada Hills, CA, as Grub House's business address.

94.    I recently listened to a recording between a creditor and TERZYAN that was made as part of that creditor's underwriting for a loan to TERZYAN.  During that recording,

TERZYAN identified himself by providing the last four digits of his (true) Social Security number that matched that on the Grub House RRF application and the EIDLs described above.  He also gave as his residence address and phone number the same residence address and phone number shown on the Grub House RRF application.  I therefore believe that TERZYAN made the representations on and submitted the Grub House RRF application and will refer to that application as such.

95.    TERZYAN claimed on the Grub House RRF that Grub House's 2019 calendar year gross receipts were $1,423,441 and that he expected to report $463,792 for gross receipts for Grub House for 2020.

96.    On the January 2021 EIDL application for Grub House that TERZYAN submitted, as described above, TERZYAN claimed that Grub House's "Actual 2019 gross revenue" was exactly one million dollars less than the amount now claimed on the Grub House RRF application, or $423,441.

97.    On the Grub House RRF application, TERZYAN identified the JPMC 3502 as the business bank account into which proceeds of the RRF should be wire-transferred (the same account into which the Grub House EIDL proceeds were transferred).

98.    TERZYAN represented on the Grub House RRF application that RRF proceeds would be used solely for Grub House's business expenses such as payroll costs, rent, utilities, food and beverage purchases, construction of outdoor seating, supplies, and other operating expenses.

99.    TERZYAN further represented on that same application that Grub House was at least 51 percent owned and controlled by "[a] socially and economically disadvantaged individual[]."

100.   On May 28, 2021, having approved the Grub House RRF application, the SBA wire-transferred proceeds of $1,864,830 to the JPMC 3502.

101.   I reviewed records for the JPMC 3502 and learned the following:

a.    As stated above, I believe that TERZYAN opened and controlled that account.

b.    The balance in the account was $524 before the RRF proceeds were credited on May 28, 2021.  As described above, substantially all of the deposits to the account from April 2, 2021, to the date of deposit of the RRF proceeds came from the Grub House EIDL proceeds.

c.    Substantially all of the Grub House RRF proceeds were paid out within about three months of the deposit of the RRF proceeds.  Below is a chart that shows the date ranges, amounts, and payees for the first six weeks of activity in the JPMC 3502 following the RRF proceeds deposit, totaling approximately $1.2 million:

| Date Range | Amount(s) | Payee |
|---|---|---|
| June 4 – August 6, 2021 | $286,084.00 | Humboldt Wholesale (Hydroponics) |
| June 8 – June 9, 2021 | $219,804.79 | Hawthorn Hydroponics |
| May 28 – December 31, 2021 | $160,000.00 | Arsen Terzyan's Personal Account |
| July 13, 2021 | $40,000.00 | Ikon Development (Koko Polosajian) |
| July 13, 2021 | $60,000.00 | Standard Home Lending (K█ P█████) |
| July 21, 2021 | $50,000.00 | M█████ L████ J█████ |
| July 22 – August 11, 2021 | $50,000.00 | Pre-Packaging and Moving Service |
| July 13, 2021 | $50,000.00 | Aykem, LLC |
| August 4, 2021 | $50,000.00 | Woodland Shane Matthew |
| June 21 – July 19, 2021 | $14,000.00 | Maria Sarkisyan |
| July 16, 2021 | $13,671.31 | Macy's |
| July 15, 2021 | $3,145.00 | Express Restoration (Mikael Mikaelyan) |

d.    The first two line items refer to payments to what I believe were marijuana cultivation supply businesses, one of which (Humboldt Wholesale) was the same such business to which SUBJECT SHAW paid out of PPPL proceeds as described above. SUBJECT MARIANNA received $14,000.

102.    RRF recipients were required to certify that RRF proceeds were used in compliance with RRF rules.  Such compliance was required via a "post-award report."

103.    Acknowledging on the post-award report that "[a]ny false statement or misrepresentation to SBA may result in criminal, civil or administrative sanctions including, but not limited to: 1) fines and imprisonment[,]" an individual identified as TERZYAN electronically signed and submitted that report in December 2021 and represented that all of the Grub House RRF proceeds were used for Grub House business expenses, as follows:

| Amount | Eligible Categories |
|---|---|
| $ 317,204.00 | Payroll (including paid sick leave) |
| $ 94,563.00 | Rent / Mortgage |
| $ 31,202.00 | Utilities |
| $ 87,750.00 | Debt Service |
| $ 45,673.00 | Construction of Outdoor Seating |
| $ 16,185.00 | Maintenance |
| $ 16,831.00 | Supplies |
| $ 928,686.00 | Food and Beverage (including raw materials) |
| $ 48,874.00 | Covered Supplier Costs |
| $ 277,862.04 | Business Operating Expenses |
| $ 1,864,830.04 | TOTAL |

104.    EDD records show that Grub House's payroll commenced during the third quarter of 2019 and that it maintained five employees through the first quarter of 2020. Grub House maintained one employee from Q2 2020 to Q4 2020. There was no EDD record of payroll during calendar year 2021. Grub House's EDD account ceased on March 31, 2022.

105.    Based on my review of the JPMC 3502, I have probable cause to believe that TERZIAN at least fraudulently misused and misrepresented on the RRF post-award report payments of $317,204 as payroll expenses, if not in excess of $600,000 more to marijuana cultivation suppliers that he fraudulently mischaracterized as other purported business-related expenses.

M.    **SUBJECT MARIANNA: Wire Fraud, False Claim, and Money
        Laundering re "Rustwood" EIDL**

106.    On May 30, 2020, an EIDL was submitted on behalf of
a shell called "Rustwood Enterprises, Inc." ("Rustwood") for
$150,000.  MARIANNA was identified as the contact person by her
true name, Social Security number, date of birth, and residence
address (the same address as SHAW).  The application identified
MARIANNA as the owner of Rustwood and stated that Rustwood had
2019 calendar year gross revenue of $1.6 million and 14
employees.  The application identified a California Credit Union
("CCU") account ending in 7905 (the "CCU 7905") as the account
to which the EIDL proceeds should be wire-transferred/deposited.

107.    EDD records and IRS Fact of Filing information
showed that Rustwood did not have any employees for the period
covered by the EIDL application.

108.    On May 30, 2020, an individual identified as
MARIANNA electronically signed the LA&A and, like that of
substantially all other EIDL LA&As, the signer promised that
"[b]orrower will use all the proceeds of this Loan solely as
working capital to alleviate economic injury caused by disaster
occurring in the month of January 31, 2020 and continuing
thereafter[.]"

109.    I reviewed the records for CCU 7905 and learned the
following:

        a.    The signature card/account application was signed
on April 1, 2020, or about two months before the Rustwood EIDL
was sought.  It contained MARIANNA's true name, Social Security

42

number, and driver's license number, each of which matched that on the Rustwood EIDL application.[5]  I compared the signature on the signature card with that of MARIANNA's driver's license and believe the signatures were written by one and the same person: MARIANNA.  The signature card stated that Rustwood was involved in "landscape design."

b.   There was minimal activity in the CCU 7905 for the months of April and May 2020, such as a transfer from another account in the name of MARIANNA for $500 to open the account and a withdrawal at a Walgreen's store in Van Nuys (which I know was in the vicinity of MARIANNA's residence).  For May 2020, there were approximately $300 in what appeared to be personal expenses (e.g., "Tigranakert Meat Marke[t]" in Van Nuys).

c.   The EIDL proceeds of $149,900 (less $100 fees) were deposited on June 29, 2020, followed by the deposit of an EIDL advance of $10,000 on July 7, 2020.  (I know from my training and experience that the SBA commonly paid EIDL applicants an advance of $1,000 for every claimed employee, up to $10,000, to hold them over until EIDL proceeds were paid; this situation was slightly different as the advance was paid *after* the proceeds.)

d.   There was no significant activity in the account until October, when approximately $100,000 – substantially, if

---

[5]  The signature card contained MARIANNA's prior residence address that MARIANNA verified in mid-2021 in connection with seeking an increase/modification of the Rustwood EIDL, as discussed below.

not solely, EIDL proceeds – was withdrawn in the form of checks
or electronic transfers.  Below is a summary of the payments
that show use of the EIDL proceeds, none of which is consistent
with the operation of a "landscape design" business or with
payment of payroll:

| Date Range | Amount(s) | Payees |
|---|---|---|
| October 1 – October 3, 2020 | $46,495.00 | Express Restoration (Mikael Mikaelyan) |
| October 6, 2020 | $18,500.00 | M███ K███████ |
| October 16 – December 16, 2020 | $26,565.00 | A███████ G████ |
| October 19, 2020 | $17,860.00 | Macy's Online Payment |
| November 4, 2020 | $15,122.00 | Ranchito Investments |
| November 25, 2020 | $3,190.00 | Body Design Rejuvenation |
| December 4, 2020 | $5,800.0 | Cornwall Group (Mikael Mikaelyan) |
| December 4 – January 6, 2021 | $22,634.00 | Toluca Commercial, Inc. |
| December 5, 2020 | $15,000.00 | American Mobile Power Solution |
| December 11, 2020 | $7,000.00 | Maria Sarkisyan |
| December 17, 2020 | $17,901.60 | First Bank |
| January 4, 2021 | $49,200.00 | Best Tudor |

110.    In April 2021, MARIANNA applied for a modification
to increase the Rustwood EIDL to $500,000.  The SBA "note"
summary for this application described a detailed conversation
between an SBA representative and MARIANNA, the relevant parts
of which are summarized as follows:

a.    The representative (identified as the "LO" (loan
officer)) stated that the LO "called and spoke w/Marianna
Sarkisyan @ 818-747-5007."  That was the same number that was
provided on the Rustwood EIDL in 2020.

b.    The LO "asked applicant PII questions to verify
information from the initial EIDL, including "date business
established, verified home & business address, verified business

44

entity—stated C corp-business Agriculture." I know from my training and experience that SBA loan officers commonly verified applicant's personal identifying information from EIDL applications in connection with vetting modification requests.

c.    The LO also verified MARIANNA's identity by confirming that MARIANNA had received a bankruptcy discharge in August 2019 and previously lived at the same address that MARIANNA had provided when she opened the CCU 7906.

d.    In response to the LO's question about why the EIDL application stated $1.6 million in gross revenue for 2019 "versus the 2019 [$570,338 in gross revenue] reported on [a tax transcript that was provided pursuant to a tax information release form signed by MARIANNA]," MARIANNA explained the more than $1 million discrepancy by stating that "she completed the [EIDL] application without her tax accountant."

e.    The LO explained that the variance was too great to approve the modification and that "applicant stated she understood."

N.    **SUBJECT MARIANNA: Wire Fraud and False Claim re Personal EIDL**

111.    SBA records show that, on July 13, 2020, fewer than two months after MARIANNA applied for the Rustwood EIDL, an online application was submitted for a $150,000 EIDL for "Marianna Sarkisyan" as a "Sole-Proprietorship" (the "MARIANNA EIDL"). The MARIANNA EIDL application contained not only MARIANNA's true name but her true Social Security number and the same residence address she had provided when she applied for the

45

Rustwood EIDL in May 2020.  The application claimed that MARIANNA was in the business of "property management/realty" and also stated that MARIANNA's "gross revenues for the twelve months prior to [] January 31, 2020" was $357,000," but mentioned nothing about her association with, or any income derived from, Rustwood.  The MARIANNA EIDL application identified a California Credit Union account ending in 0956 (the "CCU 0956") to which EIDL proceeds should be wire-transferred.

112.    The MARIANNA EIDL was approved and funded in the amount of $150,000 in August 2020.  In July 2021, an application was submitted online to modify the MARIANNA EIDL by increasing it to $500,000 (a net increase of $350,000).  An LA&A for this modification was e-signed by "Marianna Sarkisyan" on July 26, 2021 and, similar to other EIDL requirements at that time, the applicant agreed that "[applicant] will use all the proceeds of this Loan solely as working capital to alleviate economic injury caused by disaster occurring in the month of January 31, 2020 and continuing thereafter[.]"

113.    I reviewed records of the CCU 0956 and learned the following:

a.    The account was opened in 2013.  The signature card/account application identified the account holder as MARIANNA based on her true date of birth, Social Security number, and driver's license number.  The signature on the card matches that of her driver's license and the numerous checks on accounts associated with her that I have seen during this investigation.

46

b.    The proceeds of the MARIANNA EIDL modification were deposited into the CCU 0956 on July 30, 2021.

c.    The beginning balance in that account (as of July 1, 2021) was $8,234.  For the several months preceding that date, the account appeared to be largely used for personal expenses (e.g., substantial Amazon and Postmates payments, recurrent $1,820 Chase Auto Lease payments).

d.    The bulk of the EIDL proceeds were used for a variety of expenses not associated with "working capital" for a business including the same substantial Amazon payments, recurrent Chase Auto Lease payments, $8,298 in Aeroflot plane tickets, $55,000 to Rustwood, $15,000 to Pacific BMW, $4,862 to Louis Vuitton, $24,000 to Mercedes Benz of Beverly Hills, and $2,090 to Monolo Blahnik Intl London (high-end shoes).

## V.  <u>CONCLUSION</u>

114.   For all the reasons described above, there is probable cause to believe that SARKIS SARKISYAN, AKA SAMUEL SHAW; MIKHAEL MIKHAELYAN; ARSEN TERZYAN, AKA STEVEN TERZAKI; and MARIANNA SARKISYAN committed the Subject Offenses.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1
by telephone on this  23rd day of
May, 2025.



HONORABLE PATRICIA DONAHUE
UNITED STATES MAGISTRATE JUDGE